**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 12 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

ROY LEE ENGBERG,

    Petitioner-Appellant,

v.

STATE OF WYOMING, and
WYOMING ATTORNEY GENERAL,

    Respondents-Appellees.

No. 99-8092

---

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 95-CV-144-D)

---

Martin J. McClain, Brooklyn, New York, for Petitioner-Appellant.

Hugh L. Kenny, Senior Assistant Attorney General, Office of the Wyoming
Attorney General, Cheyenne, Wyoming, for Respondents-Appellees.

---

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**BROWN**,[*] District Judge.

---

**SEYMOUR**, Circuit Judge.

---

[*]The Honorable Wesley E. Brown, District Judge, United States District
Court for the District of Kansas, sitting by designation.

Roy Lee Engberg seeks leave to appeal the denial of his federal motion for a writ of habeas corpus under 28 U.S.C. § 2254. We grant his request for a certificate of appealability[1] and affirm the judgment of the district court.

# I

The resolution of Mr. Engberg's claims depends in part on whether a piece of evidence excluded from trial was sufficient to cast doubt upon the verdict. His claims also raise detailed procedural concerns. Accordingly, we set out the trial evidence and procedural background of this case at some length.

Mr. Engberg escaped from a Missouri penitentiary in 1978 and began living under an assumed name with his wife and children in Casper, Wyoming. In late 1981 he was beset by financial difficulties: he had not drawn a paycheck in several weeks, he owed a previous employer for a salary advance, the rent on the family's trailer was overdue, and the family was regularly pawning household

---

[1] Mr. Engberg's federal habeas petition was filed in 1995, prior to passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996). After his petition was filed, the Supreme Court clarified that the post-AEDPA requirement of a certificate of appealability replaces the earlier standard for any appeal filed after the act's effective date. *See Slack v. McDaniel*, 529 U.S. 473, 482 (2000). Because the required showing for constitutional claims remains the same, we simply construe Mr. Engberg's original request for a certificate of probable cause as a request for a certificate of appealability. *See Tillman v. Cook*, 215 F.3d 1116, 1120 (10th Cir.), *cert. denied*, 121 S.Ct. 664 (2000).

goods to meet immediate needs. On December 22, Mr. Engberg and his family suddenly paid the rent on their trailer, filled their car with possessions, and left Casper.

Earlier on December 22, a Wells Fargo armored car was robbed as guards picked up approximately $4,200 in cash and $9,200 in other deposits from the Buttrey Food Store in Casper. The two Wells Fargo guards, Vernon Rogers and Kay Otto, were exiting the store when a man near the door said, "Hey!" As they turned to look at him, he pulled a gun and shot Mr. Rogers in the chest. Ms. Otto turned to run into the store, but as she entered the front doors she slipped and fell. The gunman approached her and repeatedly demanded that she surrender the bag of money. He took it from her and fled on foot through the store parking lot. He fired one shot in the direction of Robert Latham, a grocery checker who was leaving for the day. Ms. Otto told store personnel to summon the police and ran after the gunman. Warning a woman with a small child not to exit her car, Ms. Otto fired her own gun at the robber but she missed and he got away. Mr. Rogers, who was Ms. Otto's brother, died at the scene.

Ms. Otto was taken to the police station, where police attempted to hypnotize her in order to enhance her recollection of the shooting. The hypnosis was reportedly unsuccessful, apparently because Ms. Otto was too upset to continue. She did, however, give some description of the gunman, stating that he

was tall (around 5'10"), slender (155 to 160 pounds), forty to forty-five years old, and wearing a brown leather jacket and an orange ski cap. She assisted in the preparation of a composite drawing on December 23, and she returned to the police station on December 24 to make some alterations to the drawing.

Other bystanders also gave descriptions of the armed robber. All described him as tall (around six feet in height), slim (with estimates ranging from 160 to 200 pounds), in his late twenties or early thirties, and wearing a brown or tan coat. Descriptions of his hair and other clothing varied slightly. One customer remembered the gunman as having light or blond hair and possibly a moustache. Two customers described him as wearing a dark stocking cap, but another customer did not remember a hat. Robert Latham, who had been shot at after making eye contact with the gunman in the parking lot, remembered the man as having reddish blond hair and a beard and wearing an old army coat and gold-rimmed glasses. After reading newspaper accounts of the shooting, however, Mr. Latham decided this description was mistaken and in fact matched another man in the crowd rather than the gunman. His later descriptions of the gunman matched that given by the other witnesses. A composite sketch of the gunman described by Ms. Otto and the other eyewitnesses was published in the local newspapers.

Investigating officers recovered several spent bullets from the crime scene and from Vernon Rogers' body. The bullets were a relatively unusual type of .38

caliber known as "S&W."  Forensic testing indicated the bullets had been fired from a revolver made by one of two companies, Armenius or FIE.

There was a break in the case on New Year's Day.  Mr. Engberg's wife, Donna, contacted the police in Las Vegas, Nevada, and explained that her husband was holding her and her two small children as virtual hostages and that she feared for her life.  She told police her husband had come home on December 22 with a large sum of cash and informed her the family would be leaving Casper immediately.  Traveling under assumed names, they made their way to Las Vegas.  When their 1970 Plymouth broke down in Rawlins, Wyoming, they had it towed to a garage.  They purchased a 1975 Plymouth sedan for $1,550 in cash and continued on their way.  Once they reached Las Vegas, Mrs. Engberg explained her husband had obtained a copy of a Wyoming newspaper carrying a story of the robbery and the sketch of the gunman.  She stated that upon seeing the story, she realized the gunman was her husband.  Mrs. Engberg later reportedly recanted these statements, telling a friend she did not believe in her husband's guilt and had made her statements to Las Vegas police as retaliation for spousal abuse.

Las Vegas police contacted the Casper police department to verify information on the December 22 robbery and murder and to notify the Casper authorities of the information provided by Mrs. Engberg.  After obtaining Mrs. Engberg's permission, Las Vegas officers searched the Engbergs' car.  They also

-5-

attempted to enter the family's hotel room, but Mr. Engberg attacked the officers and attempted to escape. He was injured in the ensuing struggle, arrested, and taken to the hospital for surgery.

The case against Mr. Engberg developed rapidly at that point. A brown jacket and dark orange stocking cap were found in his car in Las Vegas. S&W .38 caliber rounds were found in his hotel room in Las Vegas, his abandoned car in Rawlins, and his trailer in Casper. Pawn shop records in Casper showed he had pawned and redeemed a .38 caliber Armenius revolver a few weeks before the robbery. Vacationers then discovered the abandoned Wells Fargo bag containing the route clipboard and Buttrey deposit bag in a gravel pile outside Rawlins. Police photographed Mr. Engberg at the hospital, although he refused to be photographed wearing the stocking cap found in his car. When a photo lineup was presented to Kay Otto and Robert Latham, both identified Mr. Engberg as the gunman.

Mr. Engberg was tried in Wyoming state court in 1982 for aggravated robbery and first-degree felony murder. The case against him included descriptions of the scene by Kay Otto and other eyewitnesses, and testimony linking the relatively rare .38 caliber S&W cartridges found at the crime scene with Mr. Engberg's Armenius revolver and .38 S&W cartridges. Testimony also established the Engbergs' dire financial situation, sudden flight from Casper on

the day of the robbery, use of assumed names, and cash outlay for a car in Rawlins, as well as the discovery of the brown jacket and stocking cap in the Engbergs' car. Mrs. Engberg invoked her spousal privilege and did not testify; her earlier statements both for and against her husband's guilt were excluded as hearsay. Mr. Engberg's most significant defense consisted of testimony by his sister-in-law asserting that she had sent the Engbergs over $2,000 in cash at Christmas, an alternative explanation for the Engbergs' sudden change in finances. However, on cross-examination the sister-in-law admitted she had no mailing receipt or other means of substantiating her testimony, her only income came from welfare, and her bank account was generally overdrawn. After a few hours' deliberation, the jury found Mr. Engberg guilty on all counts. He was sentenced to death.

Mr. Engberg appealed, raising issues related to voir dire at trial and imposition of the death penalty. The Wyoming Supreme Court upheld his conviction and sentence over a dissent criticizing the double use of robbery and intended pecuniary gain as aggravating sentencing factors where the felony murder charge was based on the same underlying robbery. *See Engberg v. State*, 686 P.2d 541 (Wyo.), *cert. denied*, 469 U.S. 1077 (1984).

Mr. Engberg then filed a petition for state post-conviction relief. That petition contained over twenty claims, challenging *inter alia* the state's failure to

disclose the attempt to hypnotize Kay Otto, procedures related to the photos taken in the hospital in Las Vegas, the grant of marital privilege to Mrs. Engberg, and the double-counting of aggravating factors. Noting Mr. Engberg's failure to attach affidavits or other evidence to support his claims, the state moved to dismiss his petition, submitting affidavits from Ms. Otto and two police officials regarding the hypnosis attempt. Mr. Engberg responded with a motion to amend his earlier petition. He attached an affidavit from his investigator, who described contacting police officials a few days before the petition was filed and only then learning of the hypnosis attempt on Ms. Otto. The motion also added a claim that Mr. Engberg had been denied effective assistance of counsel on his direct appeal, as demonstrated by his attorney's failure to raise all of the issues presented in the petition for post-conviction relief. The state district court held a hearing on the amended petition and issued a fifty-five page order addressing each of Mr. Engberg's claims and finding many of them procedurally barred. The court denied the requested post-conviction relief.

Mr. Engberg appealed to the Wyoming Supreme Court. In a 3-2 decision, that court found the majority of his claims to be procedurally barred. Among the properly presented claims were whether the failure to disclose the attempts to hypnotize Ms. Otto denied Mr. Engberg due process, whether cumulative errors prejudiced his right to a fundamentally fair trial, and whether he was afforded

effective assistance of counsel on direct appeal. *See Engberg v. Meyer*, 820 P.2d 70, 73 (Wyo. 1991). With regard to the hypnosis issue, the court determined that state law required disclosure of the attempt to hypnotize Ms. Otto. *See id*. at 75-76. In light of the overwhelming evidence against Mr. Engberg, however, the court was persuaded that the failure to disclose the information was not prejudicial to the trial as a whole and that evidence of the hypnosis attempt was not material under the standards set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Bagley*, 473 U.S. 667 (1985). *See Engberg*, 820 P.2d at 76-78.

The court also rejected Mr. Engberg's contention that his counsel was ineffective in failing to raise on direct appeal the claims now presented in his motion for post-conviction relief. *See id.* at 78. Instead, the court examined the trial record to determine whether facts suggested "a clear and unequivocal rule of law . . . was transgressed in a clear and obvious, not merely arguable, way." *Id*. Although two of the new claims, one relating to exclusion of expert testimony on eyewitnesses and the other concerning marital privilege, arguably showed trial error under the most recent understanding of state law, the court was not persuaded these errors rose to the standard of clear transgression of law such that

the earlier failure to raise them could constitute ineffective assistance.[2] *See id.* at 79-84. Because the court determined there was no clear error at trial, it similarly rejected Mr. Engberg's claim related to cumulative trial error. *See id.* at 84.

A majority of the court did find error in the method by which Mr. Engberg's sentence was calculated. It held the same robbery could not be used both to support felony murder charges and as an aggravating factor in sentencing. Accordingly, it remanded Mr. Engberg's case for resentencing without the impermissible double-counting. *See id.* at 87. On remand, Mr. Engberg was sentenced to life in prison, to run consecutively to his original Missouri sentence and any sentence that might be imposed for the 1978 escape. The sentence was modified on appeal to remove reference to the escape penalty, since Mr. Engberg had not yet been tried for that crime. *See Engberg v. Wyoming*, 874 P.2d 890 (Wyo. 1994).

Mr. Engberg then turned to the federal courts, filing a petition for habeas corpus pursuant to 28 U.S.C. § 2254. He raised seven claims, including the hypnosis claim, the claim of ineffective assistance of appellate counsel, claims related to his wife's marital privilege and the stocking cap photos taken in the Las

---

[2] A dissenting opinion looked more favorably upon Mr. Engberg's ineffective assistance claim, asserting the procedural default of most of his claims demonstrated ineffective assistance and concluding, "appellate counsel did not render the thoughtful service to which Engberg was entitled." *Id.* at 104-116 & n.8 (Urbigkit, J. dissenting in part and concurring in part).

Vegas hospital, and a new claim alleging the state prosecutor presented a false argument regarding Kay Otto's composure during the robbery. The state moved to dismiss, arguing the claims were either procedurally barred or had been decided on their merits by the state courts. Mr. Engberg responded that the state's consideration of the merits should not be presumed correct because no evidentiary hearing was held, and that he could show cause and prejudice to excuse any procedural default based on effective assistance of counsel on direct appeal.

A federal magistrate judge considered the case and issued a report recommending that the petition be dismissed without prejudice. Although the judge pointed out that four of the claims had already been presented to the state court and deemed procedurally waived, the judge declined to consider any of the claims because Mr. Engberg had failed to exhaust his new prosecutorial argument claim in the state courts. Mr. Engberg objected to the dismissal of his petition, and the state objected to the dismissal without prejudice.

The district court noted the magistrate judge's observation that four of the claims had already been addressed in state court and held to be procedurally waived. Because neither party had objected to that statement, the court held those four issues were conclusively waived. Mr. Engberg's claims regarding the hypnosis attempt, prosecutorial argument, and ineffective assistance of counsel

-11-

remained.

Unlike the magistrate judge, the district court approached the prosecutorial argument claim as one aspect of the hypnosis issue, which was the way it had been presented to the Wyoming Supreme Court in Mr. Engberg's petition for post-conviction relief. Thus, the court concluded it did not need to dismiss the federal petition for failure to pursue state remedies. Upon considering the merits, the district court held the claim could not succeed because "the overall strength of the prosecutor's case leads the Court to believe that the error did not have a substantial and injurious effect or influence in determining the jury's verdict." Aplt. App. at 170. The ineffective assistance of counsel claim also failed because "Mr. Engberg ha[d] not shown that his counsel was deficient or a reasonable probability that the outcome of his trial would have been different had his appellate counsel raised the claimed errors." *Id*. at 171. The petition for relief was dismissed with prejudice.

## II

Mr. Engberg raises five claims on appeal.[3] He contends the district court

---

[3] Mr. Engberg's federal habeas petition was filed before April 24, 1996, the effective date of AEDPA. His claims are therefore not governed by its terms. *See Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). We observe also that at the time this petition was filed, Mr. Engberg's death sentence had been set aside in

(continued...)

-12-

should have held an evidentiary hearing regarding his *Brady* claim and his claim that the trial prosecutor misrepresented facts during closing arguments. He disputes the district court's conclusion that he waived four issues in his objections to the magistrate's report recommending dismissal of his habeas claims. He claims ineffective assistance of appellate counsel during his direct state appeal, and maintains the district court failed to address the merits of that claim. Finally, he contends the district court should not have denied his requests to proceed in forma pauperis and to have counsel appointed.

## A.    Hypnosis Claims

Mr. Engberg first asserts the district court erred in affording a presumption of correctness to the Wyoming Supreme Court's decisions regarding the undisclosed hypnosis attempt and in failing to grant him an evidentiary hearing. He also claims that he should have been granted an evidentiary hearing in order to determine the prejudicial impact of the prosecutor's statements in closing arguments that Ms. Otto was "one calm and collected lady." As explained above, the federal magistrate judge treated the second claim as a new claim not yet exhausted in state courts. The district court disagreed, and viewed the claims as two aspects of the same hypnosis issue, as it had been presented to the Wyoming

---

[3](...continued)
state court and his proceeding is no longer a capital case for purposes of AEDPA.

Supreme Court on petition for post-conviction relief. We agree that the essential substance of both claims was included in the issue considered by the Wyoming Supreme Court. Consequently, we will consider the two claims as aspects of the single issue of the effect of the prosecution's failure to disclose police attempts to hypnotize Kay Otto.

"Under pre-AEDPA law, we presume state court factual determinations to be correct." *Tillman*, 215 F.3d at 1121. This presumption applies to factual findings made by a state appellate court as well as those made by the original trial court. *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981). The presumption does not arise, however, if the applicant can establish or the reviewing court is otherwise convinced, *inter alia*:

> (1) that the merits of the factual dispute were not resolved in the State court hearing;
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
> (3) that the material facts were not adequately developed in the State court hearing; . . .
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
> (7) that the applicant was otherwise denied due process of law in the State proceeding.

*Id*. at 544-45 (quoting pre-AEDPA version of 28 U.S.C. § 2254(d)). If none of these factors is present, the presumption of correctness can only be overcome by "convincing evidence" that the state findings were incorrect. *Id*. at 545 (quoting

-14-

pre-AEDPA section 2254(d)).[4]  Significantly, the presumption applies only to basic facts; we do not apply the presumption to legal questions or mixed questions of law and fact.  *See Chaney v. Brown*, 730 F.3d 1334, 1346 (10th Cir. 1984).  The materiality of wrongly suppressed exculpatory evidence is a mixed question of law and fact to which the presumption does not apply.  *See id.*

Mr. Engberg cites several of the quoted factors in contending the district court erred by applying a presumption of correctness to the facts found by the Wyoming Supreme Court on post-conviction relief.  He argues fair trial procedures require an evidentiary hearing at which he could cross-examine Ms. Otto and those present at the hypnosis attempt in order to learn her state of mind and determine whether she, in fact, succumbed to the hypnosis procedure.  The Wyoming Supreme Court was "satisfied that no hearing is required because, under our case law, any attempt to hypnotize a witness must be disclosed."  *Engberg*, 820 P.2d at 75.  The prosecutor had an obligation to disclose the hypnosis attempt whether or not the procedure was actually successful.  *Id*.  The court nevertheless held that the great weight of other evidence against Mr. Engberg presented at trial ensured that there was "no reasonable probability that the jury's verdict would

---

[4] After AEDPA, the enumerated factors have been removed and the statute simply states that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

have been different had the use of hypnosis with respect to Kay Otto been disclosed." *Id*. at 76. We agree.

To establish a *Brady* violation, the defendant bears the burden of showing first, "that the prosecution suppressed evidence;" second, "that the evidence was favorable to the accused;" and third, "that the evidence was material." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (stating elements, and pointing out technically no "*Brady* violation" unless element of materiality is present). Here, the prosecution suppressed evidence of the attempt to hypnotize Ms. Otto and of her emotional state during the hypnosis attempt.[5] That information was favorable to Mr. Engberg, since it could have been used as impeachment evidence during Ms. Otto's testimony at trial. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule."). The only question, therefore, is whether the hypnosis evidence would have been material to Mr. Engberg's case.

Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

---

[5] There is some indication in the record that police informed the prosecution of the hypnosis attempt prior to trial. Even if that did not occur, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

-16-

would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*. at 682.  The materiality showing "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  It "is not a sufficiency of the evidence test."  *See id*.  "[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."  *Strickler*, 527 U.S. at 290.  Instead, the court must consider whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.[6]

We begin our assessment with the recognition that Kay Otto was the prosecution's most significant witness.  Moreover, because we are proceeding under a theory that an evidentiary hearing would make no difference to Mr.

---

[6] The district court, apparently relying on our discussion of posthypnotic testimony in *Tuttle v Utah*, 57 F.3d 879 (10th Cir. 1995), applied a form of harmless error analysis to consider whether failure to disclose the hypnosis attempt had a "substantial and injurious effect or influence in determining the jury's verdict."  App. at 162-170.  However, the discussion in *Tuttle* was not related to potential *Brady* violations.  When the proper standards given in *Bagley* and explained in *Kyles* are applied to a *Brady* claim, there is no need for harmless error analysis.  *See Kyles*, 514 U.S. at 436.  We therefore apply only the *Bagley/Kyles* standard.

Engberg's case, we must consider Ms. Otto's testimony in the worst possible light, *i.e.*, we assume that she was successfully hypnotized and that the hypnosis rendered her subsequent testimony wholly suspect.[7] We cannot predict with absolute certainty the outcome of Mr. Engberg's case if testimony of the prosecution's key witness had been called into serious doubt. Absolute certainty is not required in this situation, however. It is the "petitioner's burden to establish a reasonable *probability* of a different result," not merely a "*possibility*." *Strickler*, 527 U.S. at 291 (emphasis in original). Considering the other eyewitness testimony implicating Mr. Engberg and the substantial amount of corroborating circumstantial evidence,[8] we are convinced the verdict is worthy of

---

[7] Mr. Engberg alleges Ms. Otto's "memory and recall was materially altered" by the hypnosis. Aplt. Br. at 29-30. We note, however, that Ms. Otto was hypnotized only a short time after the robbery and murder. Taking his hypothesis to its most extreme possibility, that the police somehow "suggested" facts to their hypnotized witness, there would be little damage because at that early stage in the investigation they knew no facts other than those provided by *other* eyewitnesses who were also at the scene.

[8] As summarized by the Wyoming Supreme Court:

This is not an instance in which [Ms. Otto] was the only witness who identified Engberg; several other witnesses testified that he was the murderer. In addition, the record contains an abundance of circumstantial evidence linking Engberg to the robbery and murder. On the day of the murder, he inexplicably departed from Casper where the murder occurred; he had acquired money on that day, but the source of the funds is unexplained; he paid his overdue rent and rent for a week in advance even though he abandoned the rented premises that same day; he used aliases to conceal his identity; he

(continued...)

-18-

confidence despite nondisclosure of the hypnosis attempt.

To the extent that Mr. Engberg's prosecutorial misconduct arguments differ from those related to disclosure of the hypnosis itself, they are similarly unpersuasive. An evidentiary hearing on the hypnosis attempt could serve no purpose in relation to the prosecutor's description of Ms. Otto as a "calm and collected lady" because the record shows his description referred to her demeanor in photos taken just after the crime. An evidentiary hearing on her state of mind during the hypnosis attempt at the police station several hours after the robbery would provide little, if any, insight into her state of mind at the event itself. Accordingly, any error with regard to this evidence does not warrant federal habeas relief.

---

[8](...continued)
was deceptive with respect to the purpose for which he purchased a used car in Rawlins after the car driven from Casper failed; material evidence was found along the road between Rawlins and [the Engbergs' destination]; at various times, Engberg, or his wife, had pawned a .38 caliber revolver; a round of ammunition which would fit that revolver was discovered in the pocket of a vest in the abandoned mobile home; additional rounds were located in Engberg's motel room when he was arrested; and, in the automobile purchased in Rawlins, an orange-toned, multicolored ski cap and a brown lightweight jacket similar to those worn by the killer were found.

*Engberg*, 820 P.2d at 76. These are the type of basic, underlying facts to which we apply a presumption of correctness. *See Chaney v. Brown*, 730 F.2d 1334, 1346 (10th Cir. 1984).

-19-

## B.    Waiver of Claims

Mr. Engberg next argues the district court erred in holding he waived four of his habeas claims by failing to object to the magistrate judge's observation that the claims were procedurally barred. Even if we were persuaded that, under the circumstances present here, Mr. Engberg's failure to object was excusable and should not have constituted a waiver of his claims before the district court, we agree with the magistrate judge that the claims were procedurally barred in the state courts, as we discuss infra.

This circuit has "adopted a firm waiver rule" which "provides that the failure to make timely objection to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991). Mr. Engberg's case is somewhat unusual, however, in that the magistrate declined to consider *any* of his claims because of its conclusion that the prosecutorial misconduct claim had not been exhausted in state court. Mr. Engberg objected to that holding, but in view of the magistrate judge's ultimate decision not to address any claims, Mr. Engberg was arguably reasonable in failing to object to the magistrate judge's gratuitous observation that four of the claims were procedurally barred.[9] We need not

_____

[9] Of course, Mr. Engberg did object to the finding that his second claim was unexhausted, and the natural consequence of the district court's ruling in his

(continued...)

decide whether our waiver rule applies under these unusual circumstances because the claims are barred in any event.

## C. Procedural Bar and Ineffective Assistance of Counsel

As the magistrate judge observed, in ruling on Mr. Engberg's petition for state post-conviction relief the Wyoming Supreme Court held that several of the claims Mr. Engberg asserted in that proceeding were procedurally barred. Those claims include two issues that Mr. Engberg now asserts as grounds for relief in this appeal: (1) his allegation that he was denied his Sixth Amendment rights by the state trial court's decision that his wife could invoke that state's spousal privilege not to testify; and (2) his allegation that his Fifth Amendment rights were violated when the state was allowed to introduce over his objection evidence that he had refused to allow the police to photograph him wearing a stocking cap. The federal district judge addressed these claims in the context of considering whether Mr. Engberg's counsel on direct appeal had been ineffective in failing to raise them, and summarily rejected them.

"A habeas petitioner may establish cause for his procedural default by showing that he received ineffective assistance of counsel in violation of the Sixth Amendment." *Banks v. Reynolds*, 54 F.3d 1508, 1514 (10th Cir. 1995). To

---

[9](...continued)
favor would be for that court to address the magistrate's procedural waiver finding.

-21-

establish ineffective assistance, a petitioner must show that counsel's conduct fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 391 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Counsel's failure to raise an issue on direct appeal will be considered ineffective assistance where the issue is obvious from the trial record and "probably would have resulted in a reversal on appeal." *Banks*, 54 F.3d at 1515 n.13.

Mr. Engberg contends his counsel was ineffective in failing to argue on direct appeal that Mr. Engberg's Fifth Amendment rights were violated by the introduction of evidence that, while hospitalized following his arrest, he had refused to be photographed wearing a stocking cap that was found in his car and was similar to one the murderer had been described as wearing. This argument is meritless. "The Supreme Court has long maintained that the Fifth Amendment protection extends only to self-incrimination which is testimonial in nature. The privilege does not prevent a defendant from being required to put on a piece of clothing . . . ." *United States v. Lamb*, 575 F.2d 1310, 1316 (10th Cir.), *cert. denied*, 439 U.S. 854 (1978) (citing *Holt v. United States*, 218 U.S. 245 (1910).

Because Mr. Engberg had no Fifth Amendment privilege to refuse to be photographed wearing the stocking cap, his rights under that Amendment were not violated by the admission at trial of his refusal. Appellate counsel was not ineffective in failing to raise the claim and it is therefore procedurally barred.

Mr. Engberg also argues his appellate counsel was ineffective in failing to challenge the state trial court's ruling that his wife could assert a spousal privilege and refuse to testify. In addition, he challenges the trial court's refusal to allow him to present hearsay statements made by Mrs. Engberg to Janet Garner recanting her statements to the Las Vegas police which implicated her husband in the crime, and asserting that she had gone to the police in retaliation for his treatment of her.

The Wyoming Supreme Court considered these matters at length when addressing the allegation of ineffective assistance of appellate counsel raised in Mr. Engberg's petition for state post-conviction relief. *See* 820 P.2d at 80-84. As the court pointed out, Mr. Engberg made a tactical decision at trial to waive the spousal privilege on the theory that he would benefit if his wife testified favorably to him, and that if she did not and instead testified consistently with the statements she had given the Las Vegas police, he could nonetheless impeach her by using the prior inconsistent statements favorable to him that she had made to Janet Garner. When Mrs. Engberg refused to testify, the trial court ruled she

-23-

could assert the spousal privilege, and refused to allow Mr. Engberg to present the hearsay statements she had made to Janet Garner.

The Wyoming Supreme Court undertook an extended examination of the construction of the state statute setting out the spousal immunity privilege in light of prior caselaw and "the eminent authority on rules of evidence," and concluded "it certainly is arguable that the trial court correctly ruled that Mrs. Engberg could claim the privilege albeit an erroneous reason may have been advanced." In so doing, the court quoted from 8 Wigmore, *Evidence* § 2241 (McNaughton rev. ed. 1961) to the effect that the privilege seems to belong to both the party-spouse and the witness-spouse, and that the privilege is rarely denied to the witness-spouse. *See Engberg*, 820 P2d. at 83. In so doing, the court pointed out that because it was addressing the issue only with respect to whether appellate counsel had been ineffective in failing to raise it, it was "limited to a determination of whether a clear and unequivocal rule of law was transgressed." *Id.* The Wyoming court's analysis and the authorities upon which it relied convince us Mr. Engberg has not shown a reasonable probability that, had appellate counsel raised the argument before this same court on direct appeal, the claim would have resulted in a reversal of his conviction.

We reach the same result with respect to Mr. Engberg's assertion that counsel was ineffective in failing to raise the trial court's refusal to allow

-24-

admission of the hearsay statements Mrs. Engberg made to Janet Garner. Mr.

Engberg argues that by allowing Mrs. Engberg to invoke the spousal privilege, the

trial court rendered her an unavailable witness and that her hearsay statements

were therefore admissible. In determining counsel was not ineffective in this

regard, the Wyoming Supreme Court held that Mr. Engberg could not assert as

error the trial court's refusal to admit these statements because he had made no

effort to call Mrs. Engberg as a witness and she was therefore unavailable only

for the state of Wyoming. *See id.* at 83-84. The court further held that, even

assuming Mr. Engberg had been misled by the trial court and believed he could

not call his wife as a witness, it "could still find no error in the decision of the

trial court not to receive the hearsay testimony of Janet Garner." *Id.* at 84. The

court pointed out the relevant state rule of evidence that requires the hearsay

statements of an unavailable witness to "be supported by circumstantial

guarantees of trustworthiness. The contradictory versions of the events reported

by Donna Engberg to the police officer and Janet Garner concerning Engberg's

involvement in the murder demonstrate that the circumstantial guarantee of

trustworthiness was not present." *Id.* Given the definitive rejection of this claim

by the state court, Mr. Engberg has clearly not shown a reasonable probability

that, had the claim been presented on direct appeal, it would have resulted in a

reversal of his conviction. Accordingly, we conclude that Mr. Engberg has not

-25-

shown ineffective assistance of appellate counsel. For that reason, the claims discussed above are procedurally barred.

## D. Requests for Counsel and to Proceed *In Forma Pauperis*

Finally, Mr. Engberg argues the district court erred in denying his requests to proceed *in forma pauperis* and for appointed counsel, pointing out that he is imprisoned and indigent. The district court denied his request to proceed *in forma pauperis* because he had sufficient funds in his prison account to cover payment of the required filing fees. The court denied the request for appointed counsel because it did not believe the appointment necessary in the interests of justice considering Mr. Engberg's previous lack of success on identical claims, the relative simplicity of the issues, and the fact that the proceeding was for habeas relief and the case no longer involved application of the death penalty. The decision to appoint counsel is left to the sound discretion of the district court, *see Williams v. Meese*, 926 F.3d 994, 996 (10th Cir. 1991), and we see no reason to disturb it in this appeal.[10]

---

[10] "[T]here is a right to counsel in a habeas case when the district court determines that an evidentiary hearing is required." *Swazo v. Wyo. Dep't of Corr.*, 23 F.3d 332, 333 (10th Cir. 1994). As explained above, we do not believe an evidentiary hearing is necessary in this case.

**V**

For the foregoing reasons, we **AFFIRM** the judgment of the district court denying habeas relief to Mr. Engberg.