**F I L E D**

**PUBLISH**

**February 28, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee/Cross-Appellant,

v.

MIKE LAVALLEE, ROD SCHULTZ, and ROBERT VERBICKAS,

     Defendants-Appellants/Cross-Appellees.

Nos. 03-1515, 03-1522, 03-1523, 04-1000, 04-1538, 04-1540

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 00-CR-481-D)**

---

Brian K. Holland, Holland & Pagliuca, P.C., Denver, Colorado, appearing for Appellant/Cross-Appellee Verbickas.

Richard A. Hostetler, Law Office of Richard A. Hostetler, Denver, Colorado, appearing for Appellant/Cross-Appellee LaVallee.

Neil McFarlane, Denver, Colorado, appearing for Appellant/Cross-Appellee Schultz.

Karl N. Gellert, Attorney (R. Alexander Acosta, Assistant Attorney General, Bradley J. Schlozman, Acting Assistant Attorney General, and Jessica Dunsay Silver, Attorney, with him on the briefs), United States Department of Justice, Washington, DC, appearing for Appellee/Cross-Appellant United States.

---

Before **TACHA**, Chief Circuit Judge, **BRISCOE,** and **LUCERO**, Circuit Judges.

**TACHA**, Chief Circuit Judge.

This appeal relates to a three-year investigation of inmate abuse at the United States Penitentiary in Florence, Colorado ("USP-Florence"), that resulted in charges against ten former correctional officers for conspiracy and deprivation of inmates' constitutional rights in violation of 18 U.S.C. §§ 241 and 242. Following a jury trial, two correctional officers, Michael LaVallee and Rod Schultz, were found guilty of both offenses, and Robert Verbickas was found guilty of the substantive deprivation charge. All three men (collectively, "Appellants") appeal both their convictions and sentences. The Government cross-appeals their sentences. Mr. Schultz also appeals the District Court's denial of a motion for a new trial based on newly discovered evidence and the Government's suppression of evidence in violation of *Brady v. Maryland*. We have consolidated all five cases for disposition on appeal. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Beginning in 1997, the Government began investigating allegations of the widespread abuse of prisoners and the falsification of records to cover up that abuse at USP-Florence. As a result of the investigation, eight Bureau of Prisons ("BOP") correctional officers were indicted and two were charged by information. Three officers—Dennis Britt, Charlotte Gutierrez, and Kenneth Mitchell—pleaded

guilty and cooperated with the Government by providing testimony at trial.

The seven remaining defendants, including Appellants, were charged in a ten-count superceding indictment on February 6, 2001. All seven were named in Count I, which alleged a vast conspiracy of abuse and cover-up, in violation of 18 U.S.C. § 241. The remaining nine counts charged certain defendants with excessive force against individually named inmates in violation of the inmates' Eighth Amendment right to be free from cruel and unusual punishment. *See* 18 U.S.C. § 242.

At trial, the Government sought to establish a vast conspiracy to abuse inmates. Throughout trial, the Government maintained a "green light" theory in which it alleged that Captain Terry Hines had given the defendants the "green light to take care of business" with certain inmates in the Special Housing Unit[1] ("SHU") who were aggressive toward the prison staff. Several correctional officers testified that they understood this to mean that they were to abuse inmates to let them know that aggression against prison staff would not be tolerated. Although not all supervisors were tolerant of the wrongful conduct, some supervisors were.

Standard procedure at the SHU for any use of force required the officers to document the incident through memoranda. Additionally, any time there was a

---

[1]The SHU is the prison unit that prisoners were sent to if they had disciplinary problems or were otherwise being punished through administrative segregation.

planned use of force, the incident was generally videotaped. The tapes were designed to ensure that the officers acted in accordance with the BOP's "Use of Force Policy."

Accordingly, in support of its conspiracy theory under 18 U.S.C. § 241, the Government presented a case at trial that detailed the officers' agreements to provide false reports and fabricate injuries to themselves when they violated the BOP's Use of Force Policy by beating inmates unjustifiably. They presented testimony that several officers created an atmosphere that not only tolerated abuse of inmates, but encouraged it. The Government maintained that, in addition to conspiring to do so, the officers in fact violated inmates' civil rights through beatings and assaults. The facts of the incidents giving rise to the Appellants' assault convictions under 18 U.S.C. § 242 are as follows.

A.    The Howard Lane Assault

Testimony at trial demonstrated that Howard Lane, a USP-Florence prisoner, wrote several letters containing sexually explicit remarks to a female USP-Florence officer. After the discovery of the letters, Mr. Verbickas escorted Mr. Lane to Captain Hines's office, where the Captain told Mr. Verbickas and Mr. Britt to "take this piece of shit down to SHU and give him a treatment." Mr. Verbickas and Mr. Britt applied restraints to Mr. Lane's wrists and took him to the SHU. As he was led to the SHU, Mr. Lane threatened the officers and struggled against the restraints. When the trio arrived at the SHU, Ms. Gutierrez

-4-

opened a cell door as the other officers escorted Mr. Lane inside. Mr. Britt returned to the officers' station.

Ms. Gutierrez testified that she saw Mr. Verbickas punch Mr. Lane while he was standing against the wall of the cell, his hands still restrained behind his back. She further stated that Mr. Verbickas then placed him on the floor and that she kicked him in the ribs so as to avoid leaving visible injuries and the concomitant need to file an incident report. Mr. Verbickas then grabbed Mr. Lane by his collar and the seat of his pants, lifted him waist high, and dropped him on his face. Blood oozed from Mr. Lane's lip. Finally, Mr. Verbickas threw Mr. Lane up against the wall, leaving a blood stain.

Because Mr. Lane suffered visible facial injuries as a result of the beating, the officers discussed how they would falsify their incident reports to avoid an investigation. The reports ultimately filed with USP-Florence stated that Mr. Lane kicked both Mr. Verbickas and Ms. Gutierrez, and Mr. Lane threw himself up against the wall. To support this version of events, Ms. Gutierrez testified that she inflicted an injury on herself.

B.     The Pedro Castillo Assault

Pedro Castillo, another inmate in the SHU, was an orderly in that unit and responsible for cleaning as directed by the officers. During an argument with Ms. Gutierrez on the morning of April 5, 1996, Mr. Castillo threw a mop and bucket of water onto the floor. Because of this, Mr. Castillo lost his job as an orderly as

well as the freedom associated with the job; he was forced to return to 23-hour lockdown.

The Government presented evidence at trial that later that day, several officers met to discuss how they would further punish Mr. Castillo for his behavior that morning. According to the Government, the officers resolved to concoct a story that Mr. Castillo was cutting himself—he was a known self-mutilator—which would require them to perform a forced-cell move. The officers assigned roles to each other in the ensuing assault. Because a video camera was perched outside Mr. Castillo's cell, Mr. Schultz's role in the assault was to knock the camera over so that it would not record the officers entering the cell. After doing so, several officers entered the cell, pulled Mr. Castillo off his top bunk, put him on the floor, and restrained him with handcuffs. Additional testimony demonstrated that the officers then took Mr. Castillo to a holding cell where Mr. Schultz and Mr. LaVallee each struck him two or three times in the back with their fists while Mr. Mitchell held Mr. Castillo against the wall. Mr. Mitchell then released Mr. Castillo and walked back to the officers' station approximately twenty feet away; he could hear the sound of the blows as the officers continued to beat Mr. Castillo. Ms. Gutierrez then entered the cell and Mr. LaVallee told her to kick Mr. Castillo, which she did. After the assault, Mr. LaVallee told Ms. Gutierrez that they had beaten Mr. Castillo on her behalf.

Following the incident, the officers again fabricated false reports to justify

the forced-cell move. The officers reported that Mr. Castillo had been cutting himself and that when the officers entered the cell to subdue him, Mr. Schultz slipped and knocked down the camera. The reports also stated that once the officers were inside the cell, Mr. Castillo punched one of them in the head. None of the reports mentioned that Mr. Castillo was beaten.

Mr. Verbickas was charged with one count of conspiracy to violate inmates' civil rights and three substantive assault counts regarding individual inmates. Mr. Schultz and Mr. LaVallee were also charged with conspiracy. Additionally, Mr. Schultz was charged with three substantive assault counts and Mr. LaVallee was charged with four. Following approximately eight weeks of testimony and two weeks of jury deliberations, Mr. Verbickas was convicted on one count of using excessive force against Mr. Lane and was sentenced to 30 months' imprisonment. Both Mr. Schultz and Mr. LaVallee were convicted on the conspiracy charge and the substantive assault charge involving Mr. Castillo. The District Court sentenced them to 41 months' imprisonment. This appeal followed.[2]

In Mr. Verbickas's opening brief, he raises four issues that he claims warrant reversal of his conviction. Mr. LaVallee and Mr. Schultz incorporated these claims by reference into their briefs on appeal. We will therefore address

---

[2]The four remaining defendants—James Bond, Brent Gall, David Pruyne, and Ken Shatto—were acquitted on all counts and, accordingly, are not parties to these appeals.

these issues first, as they apply to all the Appellants. We will then address Mr. LaVallee's and Mr. Schultz's additional claims of error in their convictions. Finally, we will address all sentencing issues including the Appellants' claimed errors under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) and the Government's cross-appeal contesting the District Court's failure to apply an enhancement for obstruction of justice and its discretionary decision to depart downward from the applicable Guidelines range.

## III. COMMON ISSUES

A.    <u>Bureau of Prisons Attorney on Prosecution Team</u>

Jenifer Grundy served as a supervisory attorney for the BOP at USP-Florence from November 1992 to April 2002. In that position, she was responsible for providing legal services to the facility as well as to correctional officers who were accused by inmates of constitutional violations in *Bivens* actions. *See* 28 C.F.R. § 50.15 (providing legal representation to federal employees in actions arising out of performance of their official duties). When an officer would make a request for representation, Ms. Grundy would take the officer's statement and then submit it to the Department of Justice ("DOJ"). The DOJ would determine whether representation was warranted.

Prior to trial, several of the defendants in this case had *Bivens* actions filed against them. Relevant to this case, Mr. LaVallee, Mr. Schultz, and David Pruyne were each named in several actions. According to the Appellants, some of the

-8-

defendants contacted Ms. Grundy to obtain DOJ representation in the actions against them.

Later, in connection with the instant case, Ms. Grundy contacted Mr. Pruyne and another of the acquitted defendants, Brent Gall, and requested that they speak with DOJ attorney Mark Blumberg—one of the Government's prosecutors in this case—and an FBI agent. She did not represent either Mr. Pruyne or Mr. Gall at their interviews. During the interviews, Mr. Pruyne and Mr. Gall were allegedly advised that they were the targets of an investigation involving the abuse of inmates.[3]

On April 21, 2003, ten days into trial, it became apparent to the defendants, including Messrs. LaVallee, Schultz, and Verbickas, that Ms. Grundy was acting with the Government as part of the prosecution against them. They filed a joint motion to disqualify her,[4] alleging violations of Rules 1.9, 1.11 and 1.6(a) of the

_____

[3]For various reasons, the substance of these interviews later became the subject of two motions to suppress. The District Court denied Mr. Pruyne's motion to suppress as moot after Mr. Pruyne's counsel withdrew it. The District Court denied Mr. Gall's motion to suppress because, *inter alia*, there was no evidence that Mr. Gall believed that he had established an attorney-client relationship with Ms. Grundy.

[4]If this motion was untimely, our review would be severely limited, and subject only to plain error review. *United States v. Stiger*, 413 F.3d 1185, 1195 n.5 (10th Cir. 2004). It is not clear, however, that the facts giving rise to the motion to disqualify were known to the defendants before it was made. Thus, we decline to apply plain error analysis to this claim.

Colorado Rules of Professional Conduct.[5] Counsel for the Government responded that Ms. Grundy's only role in the case was to "assist and manage witnesses and just general management of the trial." The Government further explained that she had not been hired by the U.S. Attorney's Office, nor was she acting as a special assistant to the U.S. Attorney. The defendants presented evidence, however, that Ms. Grundy was acting as a "Special AUSA" and was participating in witness

---

[5]Rule 1.9 states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." Rule 1.11(b), (e), which relate to successive government and private employment, provide:

> (b) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.
> . . .
> (e) As used in this Rule, the Term "confidential government information" means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public.

Under Rule 1.6(a), "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation."

interviews. Before ruling on the motion for disqualification, the District Court ordered the Government to submit a written response and then denied the motion to disqualify as "utterly without merit."

The Appellants claim that Ms. Grundy's participation on the prosecution team violated their constitutional right to a fair trial. Indeed, "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "The right to due process and a fair trial include the essential element that there is no unfair advantage to the prosecution by reason of a prior professional relationship between a member of its staff and a criminal defendant concerning the same or closely related matter." *State v. Boyd*, 560 S.W.2d 296, 298–99 (Mo. Ct. App. 1977) (quotation omitted). "[D]ue process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter." *United States v. Schell*, 775 F.2d 559, 566 (4th Cir. 1985).

In order to determine whether disqualification of counsel is warranted because of prior representation, we ordinarily undertake a three-part inquiry in which we ask whether "(1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is substantially related to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant." *United States v. Stiger*, 413 F.3d 1185, 1196

(10th Cir. 2005) (quotations and citation omitted). If the moving party makes a non-frivolous allegation that he has had an attorney-client relationship in a substantially related matter, a district court must investigate the allegation further through an evidentiary hearing before denying a motion to disqualify. *Id.* Failure to do so constitutes an abuse of discretion. *Id.*

Here, the District Court concluded that the motion to disqualify Ms. Grundy for violations of the Colorado Rules of Professional Conduct was frivolous. Indeed, it explicitly stated that the motion was "utterly without merit." On appeal, Mssrs. LaVallee and Schultz proffer no argument to suggest that the District Court erred in concluding that Ms. Grundy violated the rules with respect to any former relationship she may have had with them. The only reference to a relationship between the Appellants and Ms. Grundy is the following:

> [S]o-called "Bivens" violations [were filed] against the Defendants and other correctional officers. LaVallee, Schultz and Bond . . . were named as Defendants in *Turner*. Pruyne was named as a defendant in *Bryant, Collins,* and *Verdecia.* Pruyne and other Defendants sought legal representation from the . . . DOJ . . . . Grundy represented Pruyne and these Defendants regarding their requests for DOJ representation. She entered into an attorney-client relationship with Defendants and gathered relevant information regarding their requests to be afforded DOJ legal representation in these civil actions.

Based on this conclusory argument, we cannot conclude that District Court erred in finding Mr. LaVallee's and Mr. Schultz's argument frivolous. In fact, neither Appellant ever averred that he actually spoke with Ms. Grundy. At the District

Court level, the factual basis for Mr. Schultz's claim—which the District Court rejected—amounted to an assertion that "[u]pon information and belief statements were given to Ms. Grundy and or a representative of the U.S. Government." We therefore find no abuse of discretion in the District Court's conclusion on this point.

Nonetheless, the Appellants argue that the court erred because it failed to conduct an evidentiary hearing to determine the extent of Ms. Grundy's attorney-client relationship with Mr. Pruyne and Mr. Gall. Although the record shows that the court had already determined that no attorney-client relationship existed with respect to Mr. Gall, the same cannot be said with respect to Mr. Pruyne. Even so, we need not decide whether the District Court erred in failing to hold an evidentiary hearing. Both Mr. Gall and Mr. Pruyne were acquitted of the charges against them and therefore are not parties to this appeal.

The remaining issue, then, is whether the three Appellants were denied a fair trial because Ms. Grundy purportedly obtained privileged information through her alleged prior representation of the Appellants' codefendants Messrs. Gall and Pruyne such that the prosecution had an unfair advantage in obtaining the Appellants' convictions. The Fourth Circuit confronted similar circumstances in *United States v. Schell*, 775 F.2d 559.

*Schell* involved the indictment of thirty-nine individuals for numerous crimes, including conspiracy to distribute controlled substances in violation of 21

U.S.C. § 846. During the investigation of the crimes, three individuals under investigation sought representation from an attorney, David Jividen. *Id.* at 562–63. Mr. Jividen represented them when they appeared before the third grand jury in the matter. *Id.* at 562. Several months later, Mr. Jividen became employed as an Assistant United States Attorney in the district in which the appellants were later indicted. *Id.* at 562. In his role as a U.S. Attorney, he appeared before the fourth grand jury leading up to the indictments. *Id.* at 563. After the grand jury returned its indictment, Mr. Jividen no longer participated in the prosecution of his former clients nor participated in any proceeding in which his former clients were witnesses or potential witnesses. *Id.* at 564. All three of his clients, along with thirty-five coconspirators, were convicted. *Id.*

On appeal, two of Mr. Jividen's former clients and two of their coconspirators appealed their convictions, arguing that Mr. Jividen's appearance before the fourth grand jury violated their due process rights and was per se prejudicial. *Id.* at 564–65. The Fourth Circuit stated:

> The relationship between an attorney and his client is a sacred one. In that relationship, the client must be secure in the knowledge that any information he reveals to counsel will remain confidential. The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client with respect to the identical matter about which the attorney originally counseled the client. Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.

-14-

*Id.* at 565 (emphasis omitted). It therefore reversed the convictions of Mr. Jividen's former clients. *Id.* at 566. In so concluding, however, the court refused to find constitutional error with respect to the appellants who had established no attorney-client relationship with Mr. Jividen and who had not demonstrated that Mr. Jividen's former clients had imparted to him confidential information regarding them. *Id.* at 566.

Similarly, in *McFarlan v. District Court*, the Supreme Court of Colorado held that a prosecutor is not automatically disqualified from prosecuting an accused because of a prior attorney-client relationship with a codefendant of the accused. 718 P.2d 247, 250 (Colo. 1986) (listing cases). It identified two factors to consider in determining whether to disqualify a prosecutor in such a case: (1) whether the accused had an attorney-client relationship with the prosecutor; and (2) whether there is any evidence that the prosecutor actually received confidential information from or about the accused. *Id.*

Here, the Appellants make only conclusory allegations that they had an attorney-client relationship with Ms. Grundy. There is no evidence that Mr. Pruyne or any defendant imparted confidential information to Ms. Grundy regarding the Appellants. Mr. Pruyne applied for and obtained DOJ representation for the three *Bivens* actions filed against him prior to the prosecution of the instant case. There is no evidence to suggest that Mr. Pruyne

-15-

communicated confidential information to Ms. Grundy on any topic other than the subject of those *Bivens* actions. The three inmates who filed those suits were not victims of the conspiracy alleged in the indictment against the Appellants. In other words, the Appellants have failed to establish that they were in any way prejudiced by Ms. Grundy's participation in their prosecution. We therefore hold that the Appellants suffered no constitutional defect in their trials.[6]

B.      Jury Instructions

The Appellants raise several claims of error with respect to the instructions given to the jury. First, they argue that the District Court erred in instructing the jury on the elements of both the conspiracy and substantive offenses. We review jury instructions in their entirety under a de novo standard of review. *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994). "In so doing, we analyze, in light of the record, whether the instructions state the governing law and whether the jury was provided an intelligent, meaningful understanding of the applicable issues and standards." *Id.* We will reverse only if we have "substantial doubt that the jury was fairly guided." *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994) (quotation omitted). Where no objection was

---

[6]To echo the words of *United States v. Bolton*, 905 F.2d 319, 322 (10th Cir. 1990), "[w]e cannot fathom the obdurate persistence of the prosecution in keeping [Ms. Grundy] on this case. The decision, in the face of objection . . . is, to say the least, aberrant. The exercise of a modicum of prudence on the part of the prosecutor would have made consideration of this issue on appeal completely unnecessary."

made below, however, we review only for plain error. *United States v. Ellzey*, 936 F.2d 492, 500 (10th Cir. 1991).

1. *18 U.S.C. § 241: Conspiracy Against Rights*

18 U.S.C. § 241 prohibits two or more people from conspiring "to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." After reading the statute to the jury, the District Court instructed it that there were four necessary elements to prove conspiracy. Instruction No. 33 stated in part:

> ONE:      The defendant whose case you are considering entered into a conspiracy with one or more persons to injure, oppress, threaten or intimidate inmates.
> TWO:      The conspiracy was directed at the deprivation of a right which is secured or protected by the Constitution or laws of the United States, here, the right not to be subjected to cruel and unusual punishment.
> THREE:    The defendant acted willfully to deprive inmates of such right.
> FOUR:     The defendant acted under color of law.

> If you should find from your consideration of all the evidence as to each defendant that any of these elements has not been proved . . . beyond a reasonable doubt, then you should find the defendant not guilty.

The District Court then elaborated on each element of the crime. Four subsequent instructions expanded upon the first element and described what it meant to be part of a conspiracy. In addition, Instruction No. 39 informed the

-17-

jury that the words "injure," "oppress," "threaten," or "intimidate," "are not used in any technical sense but may cover a variety of conduct intended to harm, frighten, prevent, or punish the free action of other persons."

Instruction No. 40 elaborated on the second element—that the conspiracy must be directed at the deprivation of the constitutional right to be free from cruel and unusual punishment. It provided that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" and whether the action taken by the defendant amounts to such conduct "turns on whether the force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." It further provided that "[f]actors to be considered in making the determination include the extent of injury suffered by an inmate, the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the person using force on the inmate, and any efforts made to temper the severity of a forceful response."

Messrs. LaVallee and Schultz[7] argue that use of certain statutory language in the above instructions is inconsistent with and dilutes the constitutional standard for determining whether there has been a conspiracy to deprive an inmate of his Eighth Amendment rights. Specifically, they argue that the words

_____

[7]Only Mr. LaVallee and Mr. Schultz complain of the 18 U.S.C. § 241 instruction; Mr. Verbickas was not convicted on that charge.

-18-

"injure, oppress, threaten, or intimidate," which appear in 18 U.S.C. § 241 and Instructions Nos. 33 and 39, allowed a reasonable jury to infer that something less than the "unnecessary and wanton infliction of pain" is sufficient to convict, which is inconsistent with *Hudson v. McMillan*, 503 U.S. 1 (1992). In other words, their argument is that the language confused the jury and permitted it to convict based on a finding that a defendant conspired to threaten or intimidate inmates, not that he conspired to violate their Eighth Amendment rights. *Cf. United States v. Kozminski*, 487 U.S. 931 (1988) (reversing convictions because instruction alleging conspiracy to deprive individuals of their Thirteenth Amendment right to be free from involuntary servitude pursuant to 18 U.S.C. § 241 allowed for conviction based upon psychological coercion which is not prohibited by the Thirteenth Amendment or the statute enacted to enforce it).

After reviewing the jury instructions in their entirety, it is clear that a jury could not convict on the conspiracy charge unless it found that the conspiracy was directed at depriving the inmates of their Eighth Amendment right. Instruction No. 33 provided that if the Government did not prove "any of these elements" it must find the defendant under consideration not guilty. *See United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) (stating that the court presumes "jurors attend closely to the language of instructions in a criminal case and follow the instructions given to them"). The same instruction provided that the conspiracy to injure, oppress, threaten, or intimidate must be "directed at the

-19-

deprivation of a right which is secured or protected by the Constitution or laws of the United States, here, the right not to be subjected to cruel and unusual punishment." Further, Instruction No. 40 correctly prescribed the scope of protection under the Eighth Amendment, stating that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment." *Hudson*, 503 U.S. at 5 (quotations, alteration, and citations omitted); *see also Kozminski*, 487 U.S. at 952–53 (holding that for purposes of prosecution under § 241 for subjecting an individual to involuntary servitude, the jury must be instructed that involuntary servitude is the compulsion of services by the use or threatened use of physical or legal coercion). Instruction No. 39 merely elaborated on the first element—that is, what it meant to be involved in a conspiracy. After reaching a conclusion on that element of the crime, the jury *also* had to conclude that the object of the conspiracy was to deprive an inmate of his Eighth Amendment right, as defined by the instructions. That the individual instructions explaining the language "injure, oppress, threaten or intimidate" did not explicitly reference the scope of the constitutional right at issue did not confuse the jury as to their task. Rather, as the District Court found, the approach was designed to minimize confusion. The court stated, "What you're really asking me to do is to put in every instruction everything that's in every other instruction so the instructions would in effect be so confusing that no one would ever understand what they mean, and I reject that." We agree. The instructions were consistent with the legal standard

-20-

for conspiracy to deprive a person of his Eight Amendment right.

  2.  *18 U.S.C. § 242: Deprivation of Rights Under Color of Law*

  18 U.S.C. § 242 prohibits a person acting "under color of any law, statute, ordinance, regulation, or custom, [to] willfully subject[] any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." After reading the statute to the jury, the District Court instructed it that there were four necessary elements to prove the deprivation of rights under § 242. Instruction No. 47 stated:

| | |
|---|---|
| ONE: | The defendant whose case you are considering deprived an inmate or inmates of a right which is secured or protected by the Constitution of the United States; namely the right not to be subjected to cruel and unusual punishment; |
| TWO: | The defendant acted willfully to deprive the inmate of such right; |
| THREE: | The defendant acted under the color of law; |
| FOUR: | The inmate suffered bodily injury as a result of the defendant's conduct. |

  The Appellants first complain that the District Court did not include a cautionary instruction that the de minimis use of physical force does not constitute cruel and unusual punishment in violation of the Eighth Amendment. The Appellants did not raise this objection to the District Court, and accordingly we review only for plain error.

  In *Hudson*, the Supreme Court established that a de minimis use of force,

unless it is of a sort "repugnant to the conscience of mankind," does not violate the Eighth Amendment's prohibition of cruel and unusual punishment. 503 U.S. at 9–10 (quotation omitted). Though the jury instructions did not make this fact clear, the Appellants have failed to establish plain error. First, Instruction No. 40, described above, helps to resolve any confusion regarding the proof needed to establish a violation of § 242. It provided that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" and that the jury should consider the relationship between the amount of force used and the need for such force. This instruction tends to exclude the possibility of a conviction based on a de minimis use of force. Second, there was no dispute at trial about whether the force used by the Appellants was de minimis. To the contrary, the Government presented evidence that Mr. LaVallee and Mr. Schultz punched Mr. Castillo in the back numerous times while he was restrained and compliant; Mr. Mitchell testified that the sound of the blows could be heard in another room fifteen to twenty feet away. The Government also presented evidence that Mr. Verbickas punched Mr. Lane while he was restrained and compliant, then picked him up off the floor waist-high and dropped him on his face, causing blood to spill from his lip. The Appellants never challenged this testimony on the basis that the force applied was de minimis; rather, they argued that they did not commit the acts at all. On this evidence, there was no occasion for the jury to consider whether the force used was de minimis. Thus the District Court did not

plainly err in failing to give such an instruction sua sponte.

Next, the Appellants claim that the jury instructions permitted the jury to convict if it found that the inmates suffered only de minimis injuries which, they argue, is prohibited by the "unnecessary and wanton infliction of pain" standard set forth in *Hudson*. Section 242 makes "it criminal to act (1) 'willfully' and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *Lanier v. United States*, 520 U.S. 259, 264 (1997). If these elements are met, and if bodily injury (but not death) results from the willful deprivation of the constitutional right, the defendant is subject to a sentencing enhancement of up to ten years. 18 U.S.C. § 242. The Appellants argue that the Eighth Amendment is not violated if the inmates only suffered de minimis injuries. As such, they claim that Instruction No. 48, which defined "bodily injury" for purposes of the sentencing enhancement as "(1) a cut, abrasion, bruise, burn, or disfigurement; (2) physical pain; (3) illness; (4) impairment of the function of a bodily member, organ, or mental faculty; or (5) any other injury to the body no matter how temporary," misled the jury and allowed them to convict if they found merely de minimis injuries, such as a small cut or exceedingly temporary injury.[8]

---

[8]The Appellants do not argue that "bodily injury" as defined in Instruction No. 48 was a misstatement of the law as it applies to the sentencing enhancement. Nor do they dispute that bodily injury resulted.

*Hudson* explained that "the extent of injury suffered by an inmate is [but] one factor that may suggest" whether the force applied was necessary or wanton, *id.* at 7, and the Court explicitly rejected a requirement that inmates show a "significant injury" to state a claim for excessive force in violation of the Eighth Amendment. *Id* at 5. Several circuits have held, however, that there has been no excessive force in violation of the Eighth Amendment when an inmate suffers only de minimis injuries. *See, e.g.*, *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc). Those courts draw a negative inference from the statement in *Hudson* that "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes. The extent of Hudson's injuries thus provides no basis for dismissal of his § 1983 claim." *Norman*, 25 F.3d at 1262 (quoting *Hudson*, 503 U.S. at 10). In other words, they infer from this statement that merely "de minimis injury can serve as conclusive evidence that de minimis force was used." *Id.* We reject this view.

In *Hudson*, the Court explained:

> In the excessive force context, . . . [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

503 U.S. at 9 (internal citations omitted). It further explained that in determining whether the use of force was wanton and unnecessary,

> it may also be proper to evaluate the need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and "any efforts to temper the severity of a forceful response." *The absence of a significant injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.*

*Id.* at 7 (quotations omitted) (emphasis added).

Therefore, we agree with the Third Circuit that in *Hudson*, the Supreme Court evidenced its "commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury." *Brooks v. Kyler*, 204 F.3d 102, 108 (3d Cir. 2000) (emphasis omitted); *see also Hudson*, 503 U.S. at 13 (Blackmun, J., concurring) (stating that "[t]he Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). A contrary holding would mean that "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." *Brooks*, 204 F.3d 108. We therefore hold that the government need not prove that an individual suffered a certain level or type of injury to establish excessive force in violation of the Eighth Amendment and 18 U.S.C. § 242.

-25-

In so holding, we recognize that the degree of injury may be highly relevant to the determination of the unreasonableness of the force used. But we decline to adopt a rule today, which we believe would be inconsistent with *Hudson*, that permits an officer to beat an inmate so long as the resulting injuries are neither permanent nor require medical attention. Accordingly, we conclude that the jury instructions did not mislead the jury as to the applicable law.

3. *Supplemental Instruction*

After approximately eight weeks of testimony, the case was submitted to the jury. The jury deliberated for ten days, at which point the district court judge called the jury into the courtroom and reread Instruction No. 29, which provided in relevant part:

> A separate crime is alleged in each count of the indictment. Under these instructions, you may find that [sic] one or more of the defendants guilty or not guilty as charged. At any time during deliberations, you may return into court with your verdict of guilty or not guilty as to any defendant concerning whom you have unanimously agreed.

The court went on to state:

> What I'm ordering you to do is to the extent, consistent with Instruction No. 29 and all of the other instructions that you have received and presumably read, if you have reached a verdict of either guilty or not guilty as to the defendant, I'm ordering you to put that verdict, if you've reached it, into an envelope, and we will seal that envelope and . . . write the words ["]this is the verdict for defendant blank["] and then each of you would then sign the envelope and . . . return[] [it] to Mr. Keech [the courtroom deputy] for safekeeping. It will not be returned to me because I don't want to see it.

And so that's what I'm directing you to do. And I want to reiterate, I
want you to do that only if . . . you have reached a verdict of guilty
or not guilty as to any defendant concerning whom you have
unanimously agreed.

If you have not reached a unanimous agreement, then you don't have
to do anything. And if you have reached a unanimous agreement,
then I'm instructing you to do what I just said.

The jury sealed five verdicts in envelopes that day, including the guilty verdict as

to Mr. Verbickas, and two more verdicts after several hours of deliberation the

following day, including the guilty verdicts as to Messrs. Schultz and LaVallee.

The Appellants argue that this instruction is error for two reasons. First,

they argue that it is an *Allen* charge[9] that impermissibly coerced the jury's

verdicts. Second, they argue that the District Court abused its discretion by

instructing the jury to return partial verdicts as it improperly invaded the province

of the jury regarding how it conducted deliberations. We address each argument

in turn.[10]

        a.    *Allen* Charge

An *Allen* charge is "a supplemental instruction given to the jury and

designed to encourage a divided jury to agree on a verdict." *United States v.*

---

[9]*See Allen v. United States*, 164 U.S. 492 (1896).

[10]To the extent that the Appellants argue that the supplemental instruction
should not have been given at all, we find that the District Court, concerned about
the length of deliberations, did not abuse its discretion in so doing. *See United
States v. McElhiney*, 275 F.3d 928, 940 (10th Cir. 2001) (stating that whether to
give an instruction at all is within the sound discretion of the trial court).

*Zabriskie*, 415 F.3d 1139, 1147 (10th Cir. 2005). When an *Allen* charge "imposes such pressure on the jury such that the accuracy and integrity of their verdict becomes uncertain," it violates a defendant's right to due process and Sixth Amendment rights to an impartial jury trial and to a unanimous verdict. *Id.* at 1148.

The District Court's instruction in this case is not a typical *Allen* charge. Generally, such an instruction urges deadlocked jurors to "review and reconsider the evidence in the light of the views expressed by other jurors" so as to avoid a mistrial. *Darks v. Mullin*, 327 F.3d 1001, 1013 (10th Cir. 2003). Nonetheless, this Court must determine whether the supplemental charge improperly coerced a jury verdict. *Id.*; *McElhiney*, 275 F.3d at 941. Factors to consider in determining whether a supplemental instruction coerced a verdict include: "(1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." *Darks*, 327 F.3d at 1013 (quotations omitted).

In the first part of the inquiry, this Court asks whether the language of the instruction is "coercive, or merely the proper exercise of [the district court judge's] common law right and duty to guide and assist the jury toward a fair and impartial verdict." *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001) (quotations omitted). There is nothing inherently coercive about the language used by the District Court. Although the instruction lacked protective language

assuring jurors holding the minority position that they were not required to relinquish firmly held convictions, it did not include any language asking jurors to reconsider their views and to change them if they believed they were wrong; it did not press hold-out jurors to yield to the majority position; and it did not impose any time restrictions on the deliberations. *See Darks*, 327 F.3d at 1014; *see also Arney*, 248 F.3d at 988 (an instruction directed at all jurors, rather than only those holding the minority view, reduces the possibility of coercion). Further, though the District Court "ordered" and "directed" the jury to seal any unanimous decisions—guilty or not guilty—in a sealed envelope while they continued to deliberate on the remaining defendants, it did not instruct them to reach a unanimous verdict as to any remaining defendants or charges. In fact, the District Court emphasized that they "don't have to do anything" if the jurors had not reached a unanimous decision.

The Appellants argue that the absence of cautionary language to ameliorate the coercive effect of the supplemental instruction—such as reminding jurors that they should not surrender their conscientiously held convictions and that the burden of proof belongs to the Government—makes this instruction per se coercive. To this end, they cite our opinion in *United States v. McElhiney*, in which this Court stated that it "has never . . . approved of an *Allen* charge that failed to incorporate an admonition regarding the juror's conscientiously held convictions." 275 F.3d 928, 943 (10th Cir. 2001). Despite the Appellants'

assertions to the contrary, however, *McElhiney* did not spell out a per se rule regarding coercion. Instead, we found that the absence of cautionary language in that case meant that the coercive effect of the instruction was "substantially heightened." *See id.* at 944. Here, however, we harken back to the language of the particular instruction and find that it was not inherently coercive.[11]

In the next two steps of the analysis, we consider the timing of the instruction and whether it was presented with other instructions. While the preferred practice is to give an *Allen* charge prior to jury deliberations and along with other instructions, there is no per se rule against giving an *Allen* charge once the jury has begun to deliberate. *Arney*, 248 F.3d at 988–89. In fact, this Court has found on numerous occasions that *Allen* charges given during deliberations were not unduly coercive. *Id.* at 989 (listing cases). Moreover, the District Court called the jury in to give the instruction on the court's own accord, before the jury indicated that it was deadlocked, which makes this instruction less coercive. *See id.*

Finally, we look at the subsequent length of jury deliberations once the supplemental instruction has been given. There is a suggestion of coercion when a jury returns a verdict soon after the supplemental instruction. *Darks*, 327 F.3d

---

[11]We also note that since our decision in *McElhiney,* we have approved of at least one *Allen* charge that did not contain the recommended cautionary language. *See Darks*, 327 F.3d 1014 (jury not coerced in returning death sentence).

-30-

at 1016. In this case, the jury resumed deliberations after receiving the instruction at 4:00 p.m. Within the hour, the jury had sealed five verdicts in envelopes. The jury was then excused for the day and they reconvened the next morning. After approximately five to six hours of deliberation that day, they reached verdicts on the remaining counts. Because the verdict forms were dated, the record is clear that the verdicts the jury put into envelopes shortly after the instruction included complete acquittals for four of the defendants, and a guilty verdict as to Mr. Verbickas on one count and acquittals on the remaining counts. The verdicts returned the following day convicted Mr. LaVallee and Mr. Schultz of two counts each and acquitted them of the other counts. In this case, because the jury had not indicated that it was deadlocked as to any of the defendants, it is reasonable to conclude that the jury had already reached unanimous decisions as to the five verdicts sealed on June 23, even before the instruction was given—indeed, the jury had already deliberated for ten days at that point. In addition, it was almost a full day later that the jury reached verdicts as to Messrs. Schultz and LaVallee. *See Darks,* 327 F.3d at 1016 (upholding verdict returned twenty minutes after the challenged instruction). After viewing the supplemental instruction in light of the totality of the circumstances, we conclude that it was not coercive and therefore did not deny the Appellants their rights to a fair trial, an impartial jury, and a unanimous verdict.

b. Partial Verdict Instruction

-31-

In trials with multiple defendants, Fed. R. Crim. P. 31(b) permits a jury to return a verdict at any time during its deliberations as to any defendant about whom it has unanimously agreed. The Appellants argue that the supplemental instruction "ordering" the jurors to seal verdicts in envelopes improperly invaded the province of the jury regarding how it conducted deliberations. We review submission of supplemental jury instructions once the jury has retired for an abuse of discretion. *United States v. Arias-Santos*, 39 F.3d 1070, 1075 (10th Cir. 1994).

The District Court, in giving its supplemental instruction, initially repeated the language of Instruction No. 29, but it then altered that language by ordering the jury to seal any unanimous verdicts it had already reached. In other words, unlike Instruction No. 29, which afforded the jury discretion as to whether or not to return any partial verdicts, the supplemental instruction effectively removed that discretion by directing the jury to return any partial verdicts that had been reached at that point. Thus, the supplemental instruction clearly had the potential to infringe on the jury's discretion to decide for itself what deliberative process to utilize and undoubtedly infringed on the jury's discretion to decide when, if at all, to report a partial verdict. *See United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981) (discussing right of jury to return partial verdict in multi-defendant trial). We therefore hold that giving such an instruction was error. Nevertheless, we need not remand if we conclude that the error was harmless beyond a reasonable

-32-

doubt. *See Stiger*, 413 F.3d at 1191 (potential error in verdict form did not warrant remand when any error did not affect the outcome of the trial).

The Appellants argue that the partial verdict instruction had the same effect as an *Allen* instruction, i.e., improperly coercing the jury to reach a verdict as to the charges still being deliberated at the time the District Court gave the supplemental instruction. We concluded above that this instruction did not coerce the jury's verdict. As such, we hold that the District Court's error in giving the supplemental instruction was harmless beyond a reasonable doubt.

C.    Cumulative Error

The Appellants argue that they were denied their due process right to fundamental fairness through the combined effect of three discovery errors and thirteen errors in admitting testimony. A cumulative error analysis aggregates all the errors that individually are harmless, and therefore not reversible, and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). "Only actual errors are considered in determining whether the defendant's right to a fair trial was violated." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

1.    *Discovery Rulings*

Ms. Gutierrez was one of the Government's principal witnesses for both the conspiracy and assault charges. In March 2002, more than a year before trial

commenced, Mr. Verbickas filed a motion for the production of Ms. Gutierrez's psychiatric records to be used during cross-examination as impeachment evidence. The District Court denied the motion because the documents requested were privileged and the defendants cited no relevant authority to suggest that privileged documents were subject to discovery for purposes of cross-examination.[12] The Appellants argue that this ruling violated their Sixth Amendment right to confront witnesses against them. *See Delaware v. Fensterer*, 474 U.S. 15, 18–19 (1985) (per curium) (stating that the right to confront a witness includes the right to conduct cross-examination).

The Appellants have failed to provide this Court with any relevant authority suggesting that the Confrontation Clause permits them to discover the privileged medical records of an adverse witness. Even so, we undertook our own review of the case law and find that the Appellants's Sixth Amendment rights were not implicated by the District Court's order.

The Confrontation Clause is not a "constitutionally compelled rule of pretrial discovery." *Pennsylvania v. Ritchie*, 408 U.S. 39, 51 (1987). In rejecting the defendant's claim that the trial court's refusal to permit discovery of

---

[12]The District Court also denied the motion because the motion was improperly filed under Fed. R. Crim. P. 17(c), rather than the general discovery statute, Fed. R. Crim. P. 16. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 219 (1951) (stating that Rule 17(c) is not intended to provide a means of discovery for criminal cases).

privileged communications by his accuser to be used during cross-examination violated his right to confront witnesses against him, the Court in *Ritchie* stated:

> [T]he right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Id.* (citations, quotation marks, and footnote omitted). There is no indication in this case that the Appellants did not have the opportunity to cross-examine Ms. Gutierrez effectively. Indeed, the District Court did not appear to limit the scope of questions that the defendants could ask Ms. Gutierrez on cross-examination. Thus, there has been no Sixth Amendment violation.

The Appellants' next claim of error in discovery relates to alleged promises made by the Government to Ms. Gutierrez in exchange for her testimony at trial. Specifically, the Appellants point out that Ms. Gutierrez pleaded guilty to violating 18 U.S.C. § 242, which the District Court considered to be a "crime of violence." Nevertheless, she was released pending sentencing, which is only permitted pursuant to 18 U.S.C. § 3143(a)(2) when the court "finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community" and either "there is a substantial likelihood that a

motion for acquittal or new trial will be granted[,] or an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person." 18 U.S.C. § 3143(a)(2); *see also* 18 U.S.C. § 3142(f)(1)(A) (including crimes of violence in subsection (A)). According to the Appellants, an off-the-record colloquy took place between Ms. Gutierrez and her counsel, the magistrate judge, and the Government. The Appellants claim that the District Court made a discovery ruling prohibiting them from discovering the substance of this conversation and that such ruling violated their due process rights under *Giglio v. United States*, 405 U.S. 150, 154 (1972).

We decline to review this claim of error. In addition to failing to supply relevant legal authority,[13] the Appellants fail to cite to references in this ninety-volume, ten-thousand-page transcript where this issue was raised and ruled upon below. *See* 10th Cir. R. 28.2(C)(2) and (3); *United States v. LaHue*, 261 F.3d 993, 1014–1015 (10th Cir. 2001). Due to these failures, this court cannot even attempt to assess the merits of this argument.

Appellants next argue that the District Court erred in refusing to permit them to discover the substance of an interview by the Government of Mr. Britt. Mr. Britt was twice interviewed by the Government prior to giving testimony in

---

[13]The Government correctly points out that the cases upon which the Appellants rely, *United States v. Brady*, 373 U.S. 83 (1963) and *Giglio*, 405 U.S. 150, relate to the Government's suppression of evidence, not a district court's erroneous evidentiary rulings.

this case.  One interview was reduced to writing; the other was not.  After direct and cross-examination of Mr. Britt, counsel for Mr. Verbickas sought permission from the District Court to put Mr. Britt back on the witness stand to determine whether a second statement was in fact recorded.  The District Court asked the Government whether there were any other written statements, to which Mr. Blumberg said no.  The court then instructed the defendants to file a written motion to recall Mr. Britt to the stand.  There is nothing in the record indicating that any of the defendants filed such motion.  Therefore, any error appears to be that of the Appellants.

Finally, the Appellants argue that the District Court erred in refusing to allow Mr. Verbickas's counsel to cross-examine Mr. Britt as to whether he knew of Mr. Lane's history of violence.  Mr. Britt testified on direct that Mr. Verbickas's use of force against Mr. Lane was excessive and contravened the BOP "Use of Force" policy.  Counsel for Mr. Verbickas cross-examined Mr. Britt and asked him detailed questions about his knowledge of Mr. Lane's history of violence.  After a while, the Government objected on the grounds that Mr. Verbickas's counsel was, in effect, testifying about Mr. Lane's violent background.  The District Court sustained the objection in part, permitting counsel to "ask the witness if he has any knowledge about why Lane was at [a medical facility], without your question revealing why he was there."  The court further stated, "I'm not foreclosing this evidence, but I'm foreclosing it through a

witness that doesn't know anything about it." The Appellants argue that this prohibited the jury from evaluating the basis of Mr. Britt's testimony that Mr. Verbickas's use of force was excessive. We conclude that this argument has no merit. The District Court did not prevent the Appellants from asking about Mr. Britt's foundation for his testimony.

2. *Evidentiary Rulings*

The Appellants make several additional objections on appeal that relate to Ms. Gutierrez's testimony. First, they argue that the Government improperly asked her two leading questions. Only one of these questions was objected to, however, and the District Court sustained the objection before Ms. Gutierrez could answer the question. In addition, the Appellants argue that the District Court erred in prohibiting testimony regarding a purported prior inconsistent statement made by Ms. Gutierrez. Specifically, the Appellants argue that after Ms. Gutierrez testified about inmate abuse at USP-Florence, the court should have permitted them to call Lieutenant Mark Mooneyham to testify that Ms. Gutierrez had, in fact, previously told him that she had no knowledge of inmate abuse at USP-Florence and that Mr. Blumberg threatened that she might lose custody of her children if she did not cooperate with the Government's investigation. During her testimony, however, Ms. Gutierrez admitted that she had previously made that statement to Mr. Mooneyham. The District Court ruled that Ms. Gutierrez's testimony was consistent with what Mr. Mooneyham would testify to and

therefore Fed. R. Evid. 613(b) did not apply. We find no error in any of these rulings.[14]

Next, the Appellants argue that the Government improperly elicited testimony that they had reputations for violent behavior. They complain of the following colloquy between Mr. Blumberg and Raymond Holt, the warden at USP-Florence:

Q: Did you obtain information—excuse me. Did you learn the reputation of individuals or the character of being unnecessarily violent relating to certain correctional officers at Florence?

A: Yes.

Q: Did you learn that reputation for a correctional officer named Rod Schultz?

A: Yes.

[Mr. Schultz's counsel objected and the objection was overruled.]

Q: Did you learn that reputation for a correctional officer named Mike LaVallee?

A: Yes.

Q: Did you learn that reputation for a correctional officer named Ken Shatto?

A: Yes.

---

[14]The Appellants also object to a question asked by Mr. Blumberg on re-direct examination as to whether Ms. Gutierrez had ever met Mr. LaVallee's attorney in the presence of the defendants. We discuss this question *infra* in section IV and conclude that permitting the question did not constitute error.

Q: Did you learn that information related to a correctional officer named David Pruyne?

A: Yes.

Q: Did you learn that information regarding a correctional officer named Robert Verbickas?

A: Yes.

. . . .

Q: What was that reputation for those people that you learned prior to coming to Florence?

The defendants objected to the last question and the jury was excused while the court determined whether it would permit Mr. Holt to answer. Ultimately, the District Court barred admission of the reputation testimony pursuant to Fed. R. Evid. 403.

Appellants argue that Mr. Holt's affirmative responses to the prosecutor's initial questions is reputation testimony that violated Fed. R. Evid. 404(b). Rule 404(b), however, relates to evidence of other crimes, wrongs, or acts. In other words, it applies to specific instances of conduct. The challenged questions, on the other hand, refer to defendants' reputations for violent behavior, not to any specific instances of conduct, and therefore Rule 404(b) is not implicated. We also question whether this testimony is reputation testimony at all. Mr. Holt merely testified that he had information about whether each Appellant had a reputation for unnecessarily violent behavior; he did not testify as to *what that*

-40-

*reputation was*, i.e., that any Appellant had a violent or nonviolent reputation. This question was necessary to establish foundation for the follow-up question. Indeed, the court sustained the Appellants' objection as to that question, and the jury never heard Mr. Holt's answer. We therefore find no abuse of discretion in the admission of such testimony.[15]

The Appellants raise nine other alleged errors in admitting testimony. For these claimed errors, they either fail to identify the statements which they contend were wrongly admitted, fail to meet this court's modest requirement that an appellant provide citations to the record where these statements might be found, or fail to provide argument or legal authority for these alleged errors. Due to these failures, we decline to assess the merits of these arguments. *United States v. McClatchey*, 217 F.3d 823, 825–26 (10th Cir. 2000).

In sum, we have found no error in any of the District Court's discovery and evidentiary rulings. We therefore conclude the Appellants's assertion that the cumulative impact of errors deprived them of a fair trial is without merit.

## IV.  ADDITIONAL ISSUES RAISED BY MR. LAVALLEE

Mr. LaVallee argues that Mr. Blumberg engaged in several instances of prosecutorial misconduct that fatally infected his trial. During trial, Mr.

---

[15]The Appellants also argue that this testimony was hearsay that violated the Sixth Amendment's Confrontation Clause. This argument is without merit, as it is clear that the testimony was not hearsay.

Blumberg made several references to Mr. LaVallee's attorney, Thomas Hammond.  Mr. LaVallee argues that these references permitted the jury to draw an adverse inference from the fact he exercised his Sixth Amendment right to counsel and that therefore his conviction should be reversed.  *See United States v. Liddy*, 509 F.2d 428, 442–445 (D.C. Cir. 1974).

Allegations of prosecutorial misconduct are mixed questions of law and fact which we review de novo.  *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002).  When the defendant makes a timely motion for a mistrial based on prosecutorial misconduct, we review the district court's decision for an abuse of discretion.  *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001).  We will not reverse a conviction on the basis of a prosecutor's improper statement to the jury unless there is reason to believe that it influenced the jury's verdict.  *Meienberg*, 263 F.3d at 1180.  In assessing whether the misconduct had such an impact, we look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole.  *Id.*

Mr. Blumberg first made reference to Mr. Hammond during redirect examination of Ms. Gutierrez.  During the exchange, Mr. Blumberg elicited testimony from her that she had previously met Mr. Hammond at a meeting in the company of the other defendants.  Mr. Hammond objected, and the judge held a sidebar conference.  During the conference, Mr. Blumberg proffered that Ms. Gutierrez would testify that after the meeting, certain defendants had a discussion

-42-

about not telling their attorneys the truth about the beatings.[16]  The District Court excused the jury, and Mr. Blumberg questioned Ms. Gutierrez on the issue.  After her testimony, the District Court found that Mr. Blumberg's proffer at the sidebar was contrary to what Ms. Gutierrez had just testified.  The court therefore disallowed the testimony to be relayed to the jury and sanctioned the Government by prohibiting it from eliciting evidence about a conversation that Ms. Gutierrez had with Mr. Schultz in which he told her not to tell her lawyer the truth about what went on in the prison.  The court, however, denied Mr. Hammond's motion for a mistrial based on the testimony Mr. Blumberg had succeeded in eliciting in front of the jury—namely, that there had been a meeting among some defendants and Mr. Hammond—because it found that testimony admissible since six of the seven defense attorneys had asked Ms. Gutierrez on cross-examination whether she had ever met with them before.  Even so, when redirect examination resumed, the District Court gave the jury a cautionary instruction to disregard any testimony it had heard about that meeting.  We conclude that because the jury only heard unobjectionable testimony and was, in any event, instructed not to consider it, the District Court did not abuse its discretion in denying Mr. Hammond's motion for a mistrial.

---

[16]Mr. Blumberg reasoned that such testimony was relevant to whether the defendants had willfully deprived the inmates of a constitutional right under 18 U.S.C. § 242.

Mr. Blumberg again made reference to Mr. Hammond during cross-examination of Mr. LaVallee. Mr. Blumberg asked whether Mr. LaVallee knew that several murders took place at USP-Florence while he worked there, to which Mr. LaVallee responded that he had no personal knowledge of such murders. Mr. Blumberg asked, "Was that because you didn't prepare for that [question] with Mr. Hammond?" Mr. Hammond objected, arguing that the question was improper, but he did not move for a mistrial. The District Court overruled the objection. Mr. Blumberg later commented that defense counsel were "peddling" defenses. Two attorneys objected to the question based on its characterization and that it was argumentative. No defendant moved for a mistrial.[17]

We need not tarry on whether these remarks constituted prosecutorial misconduct because we are satisfied that they did not affect the trial's outcome. These two flippant remarks must be evaluated in the context of an eight-week trial. This conduct, even if improper, was not "flagrant enough to influence the jury to convict on grounds other than the evidence presented." *See Meienberg*, 263 F.3d at 1180 (quotations omitted). As such, we conclude that any misconduct was harmless beyond a reasonable doubt.

_____

[17]Mr. Blumberg also asked whether it was Mr. LaVallee's belief that Ms. Gutierrez's lawyer had coordinated witness's testimony. This reference to Ms. Gutierrez's attorney did not involve any adverse inference drawn from Mr. LaVallee's invocation of his right to counsel and we therefore do not address it here.

## V. ADDITIONAL ISSUES RAISED BY MR. SCHULTZ

A.    Sufficiency of the Evidence

Mr. Schultz argues that the Government lacked sufficient evidence to support his conviction for deprivation of rights under color of law because the testimony of Ms. Gutierrez and Mr. Mitchell was contradictory in several respects.[18]  Claims of insufficiency of the evidence are reviewed de novo.  *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004).  "Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt."  *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002).

Mr. Schultz does not dispute that the witnesses, despite their disparate recollection of non-material details, provided testimony which, if believed, satisfied each element of the crimes for which he was convicted.  Essentially, then, Mr. Schultz's argument amounts to an attack on Ms. Gutierrez's and Mr. Mitchell's credibility.  This argument must be rejected.  "To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses."  *United States v. Owens*, 70 F.3d

---

[18]For instance, the witnesses had differing recollections about what the abused inmate was wearing at the time of the abuse and the relative positions of the other correctional officers in the cell.

1118, 1126 (10th Cir. 1995) (quotations omitted); *see also United States v. Washita Constr. Co.*, 789 F.2d 809, 816–17 (10th Cir. 1986) (rejecting sufficiency of the evidence argument based on inconsistencies in testimony of government witnesses).

B.      Motion for a New Trial

1.      *Violations Under* Brady v. Maryland *and* California v. Trombetta

Bureau of Prisons policy requires correctional officers routinely to videotape any calculated use of force on an inmate. The warden reviews the videotapes to ensure that the officers follow the appropriate procedures during the use of force. The tapes are retained for up to two years and then destroyed in the ordinary course of business. If an incident is serious and has been referred for possible criminal investigation, the tape might be retained, placed into evidence, and controlled more closely.

Beginning in July 2001, the defendants made several requests for the tapes created on April 5 and 6, 1996 during forced-cell moves of Pedro Castillo, the inmate whom Mr. LaVallee and Mr. Schultz were convicted of abusing. After each request, the BOP responded that the tapes no longer existed. Mr. Schultz made one last request for the tapes shortly before his sentencing. This time, the Government responded to the request by producing the tape created on April 6, 1996, the day after the incident giving rise to Mr. Schultz's and Mr. LaVallee's convictions.

The tape shows Mr. Castillo slashing at his chest and legs, attempting to draw blood. Mr. Schultz approaches the cell and instructs Mr. Castillo to put his hands through the food gate so that he can be handcuffed. Mr. Castillo complies and Mr. Schultz enters the cell to fasten a chain around Mr. Castillo's waist. Mr. Schultz then escorts Mr. Castillo to the x-ray room without incident. Mr. Schultz moved for a new trial, arguing that the Government suppressed favorable and material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

When the Government withholds evidence on demand of a defendant which, if made available, would tend to exculpate him, it violates the due process rights of that defendant. *Brady*, 373 U.S. at 87. The Government's good faith is not relevant. *Id.* While we ordinarily review a district court's denial of a motion for a new trial for an abuse of discretion, when the motion is based on an alleged *Brady* violation, we review the district court's decision de novo. *See United States v. Combs*, 267 F.3d 1167, 1172 (10th Cir. 2001). To establish a *Brady* violation, "a defendant must demonstrate (1) the prosecution suppressed evidence,[19] (2) the evidence was favorable to defendant, and (3) the evidence was material." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir.

---

[19]The "prosecution" for *Brady* purposes encompasses not only the prosecutors handling the case, but also extends to law enforcement personnel and governmental entities involved in investigative aspects of a particular criminal venture. *Smith v. Sec'y of N.M. Dept. of Corrs.*, 50 F.3d 801, 824 (10th Cir. 1995).

1999).  There is no dispute in this case that the prosecution suppressed evidence within the meaning of *Brady*.  We therefore concentrate our analysis on the remaining two factors.

Evidence is favorable to the defendant if it constitutes either exculpatory or impeachment evidence.  *Smith v. Sec'y of N.M. Dept. of Corrs.*, 50 F.3d 801, 825 (10th Cir. 1995).  Mr. Schultz argues that the evidence is favorable to him because it shows Mr. Castillo cutting at his chest and legs to draw blood.  According to Mr. Schultz, this casts doubt on the Government's theory of the case—that the defendants fabricated a reason to move Mr. Castillo from his cell to beat him—and supports his defense that Mr. Castillo was in fact trying to injure himself the previous day.  He also argues that it is favorable because it shows Mr. Schultz and Mr. Castillo interacting without incident.  The Government counters that this tape does not rebut their theory of the case—inmate Castillo was a known self-mutilator and the Government's theory was that the defendants falsely claimed that he had been cutting himself on April 5 precisely because it was a plausible explanation for entering his cell.  In this regard, the tape is consistent with the Government's evidence.  We need not conclusively resolve whether this evidence was favorable to Mr. Schultz, however, because we find that it was not material to his guilt.

Evidence is material to the defendant if it creates a "reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding

would have been different.'" *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Mr. Schultz argues that there is a reasonable probability that had the videotape been disclosed he would have been acquitted because it defies common sense to believe that Mr. Castillo would cooperate with Mr. Schultz if Mr. Schultz had abused him the previous day.

To the contrary, the District Court found, and we agree, that the videotape is consistent with the fact that Mr. Castillo was beaten the previous day and does not cast sufficient doubt on the fact that Mr. Schultz participated in that abuse. The Government presented evidence at trial that on April 5 Mr. Castillo was beaten in the kidney area. The video shows Mr. Castillo's abdomen wrapped in bandages consistent with the area of beating. Further, the video shows Mr. Castillo moving somewhat gingerly, which is also consistent with testimony that he was abused the previous day. That the video shows Mr. Schultz and Mr. Castillo interacting without incident does not undermine our confidence in the outcome of the trial. As the District Court noted, "[i]t is a fact of life that in a prison setting, prisoners are forced to interact on a daily basis with the correctional officers, even those officers that may have mistreated or abused the prisoners." The tape merely shows Mr. Castillo cooperating with the officers the

day after the assault and as such, it has little bearing on what occurred the previous day. *Cf. Engberg v. Wyoming*, 265 F.3d 1109, 1118 (10th Cir. 2001) (evidence that creates a mere "possibility" of a different result does not meet the standard for "reasonable probability"). We therefore hold that the evidence was not material and, as such, Mr. Schultz's due process rights were not violated.

Mr. Schultz also argues that the Government's destruction of the April 5, 1996 videotape violated his due process rights and warrants a new trial under *California v. Trombetta*, 467 U.S. 479 (1984). Mr. Schultz did not raise this issue to the District Court. Accordingly, we review the District Court's failure sua sponte to realize that the destruction warranted a new trial only for plain error. Fed. R. Crim. P. 52(b); *United States v. McDonald*, 933 F.2d 1519, 1524 (10th Cir. 1991).

For the government's destruction of evidence "to rise to the level of affecting a defendant's due process rights under *California v. Trombetta*, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of a nature that the defendant would be unable to obtain it by other reasonably available means.'" *United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003) (quoting *Trombetta*, 467 U.S. at 489)). In addition, the defendant must show that the government acted in bad faith. *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Even if Mr. Schultz could show that the exculpatory value of the video was

apparent before the video was destroyed, he fails to show that the tape was destroyed in bad faith. He argues that the failure of the Government to preserve the tape undermines the only reason the tape was created in the first place and it was therefore done in bad faith. To the contrary, there is unrebutted testimony that these tapes, used to ensure that the correctional officers used the proper procedures during forced-cell moves, were routinely destroyed in the ordinary course of business approximately two years after their creation. Mr. Schultz notes that the Government first became aware that Mr. Castillo was beaten when it spoke with Ms. Gutierrez in February 2000, nearly four years after the incident. When the defendants made their first request for the video in 2001, it had already been destroyed. Therefore, Mr. Schultz has failed to establish the District Court plainly erred in not granting a new trial on its own initiative due to the Government's bad-faith destruction of exculpatory evidence.

2. *Newly discovered evidence*

During the investigation that led to Mr. Schultz's indictment, FBI investigators questioned Mr. Castillo. Mr. Castillo told the investigators that he was beaten by several correctional officers around the first of April 1996. Though he could not recall all of the officers' names who participated in the abuse, he did state that all the officers who took part in the forced-cell move committed the abuse. He did not identify Mr. Schultz by name. Since Mr. Schultz was on duty that night, however, the Government began investigating

-51-

him.  Several of Mr. Schultz's coconspirators identified him as a participant.  In February 2001, the Government filed a superceding indictment against Mr. Schultz for the abuse of Mr. Castillo.  He was tried and convicted over two years later in June 2003.

Mr. Castillo was incarcerated until May 2002.  During this time, Mr. Schultz never attempted to interview Mr. Castillo about his allegations of abuse.  Nor did Mr. Schultz attempt to locate Mr. Castillo after his release but prior to trial.  Mr. Castillo was not a witness at trial.  After Mr. Schultz was sentenced to 41 months' imprisonment in November 2003, however, he employed a private investigator to locate Mr. Castillo; the investigator found Mr. Castillo within six weeks.  After finding him, the investigator showed Mr. Castillo a photo of Mr. Schultz and asked whether Mr. Schultz ever beat him.  Mr. Castillo responded that Mr. Schultz had not done so and that, in fact, Mr. Schultz had treated him with dignity and respect.[20]  Mr. Schultz filed a motion for a new trial, which the District Court denied.

---

[20]We note, however, that Mr. Castillo's testimony is hardly conclusive of the issue.  Mr. Castillo provided several inconsistent statements regarding Mr. Schultz's participation in the abuse.  For example, he stated he believed Mr. Schultz did not participate in the beating because Mr. Castillo "was sure [Mr. Schultz] had not been on duty or present" that night.  After being presented with information that Mr. Schultz admitted not only to being present, but also to participating in the forced-cell move, Mr. Castillo acknowledged that his memory of the events seven years earlier was vague and that he could not positively state whether Mr. Schultz took part in the abuse.

Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial if the interests of justice require one. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). We review rulings on a motion under Rule 33 for an abuse of discretion. *Id.* We apply a five-part test to determine whether newly discovered evidence warrants a new trial. *Id.* at 1147. The defendant must show:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.*

The District Court denied Mr. Schultz's motion for several reasons. First, the court found that Mr. Schultz did not use due diligence in attempting to locate Mr. Castillo before trial. Second, the court determined that Mr. Castillo's statements constituted only impeachment evidence because previous statements he had made to the FBI were inconsistent with his current statements. Last, the District Court concluded that there was not a reasonable probability that the evidence would result in an acquittal if Mr. Schultz was to be given a new trial. Because we agree that Mr. Schultz failed to exercise due diligence in discovering the evidence before trial, we need not address whether Mr. Castillo's testimony is merely impeaching or whether there is a reasonable probability that it would

result in an acquittal.

Due diligence does not require that a defendant exercise the highest degree of diligence possible to locate evidence prior to trial; only "reasonable diligence" is required. *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977). This requirement prevents defendants from keeping "an evidentiary trump card in the event of a conviction." *Quintanilla*, 193 F.3d at 1147. Mr. Schultz does not dispute that he made no attempt to interview Mr. Castillo before trial. Nor can he argue that he was unable to interview Mr. Castillo before trial, as Mr. Castillo was incarcerated for a full fifteen months after the Government filed the superceding indictment against Mr. Schultz. Rather, he contends that the standard for diligence should be lowered because the Government produced misleading reports that indicated Mr. Castillo had identified him as one of the abusers. As support for this proposition he cites our decision in *United States v. Sinclair*, 109 F.3d 1527, 1532 (10th Cir. 1997) in which we refused to apply the Seventh Circuit's lower standard for evaluating the fifth prong of the test—that is, when newly discovered evidence would likely produce an acquittal after a subsequent trial. We stated:

> [W]e are unwilling to apply the *Larrison* possibility standard when, as here, the allegedly false testimony is merely impeaching. We recognize that the possibility standard applied in *Larrison* and subsequent cases might be appropriate when the government has knowingly, recklessly, or negligently offered false testimony. However, Mr. Sinclair has not alleged, nor does the record show, that the government knowingly, recklessly, or negligently used Dallas

Woods's testimony about his school attendance. We therefore conclude that the *Larrison* possibility standard should not be applied under the circumstances in this case.

*Id.* at 1532 (citing *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928)).

Mr. Schultz argues that the Government knowingly, recklessly, or negligently offered misleading documents and that such conduct should lessen his due diligence requirement. We decline to adopt such an approach. The requirement of "reasonable diligence" adequately accounts for any misconduct by the Government. Moreover, the reports from the interviews of Mr. Castillo do not falsely claim that Mr. Castillo identified Mr. Schultz personally. They merely state that Mr. Castillo alleged that he was beaten by all the officers who participated in the forced-cell move—and Mr. Schultz admits that he participated in that process. We therefore find no abuse of discretion on the part of the District Court in denying Mr. Schultz's motion for a new trial.

3.    *Prosecutorial Misconduct*

Last, Mr. Schultz argues that the prosecution, knowing that the April 5, 1996 videotape of Mr. Castillo's forced-cell move was destroyed in the ordinary course of business, misrepresented to the jury that the defendants destroyed the tape as part of their conspiracy to deprive Mr. Castillo of his constitutional rights.[21]

---

[21]We note that Mr. Schultz's argument on this basis cuts against his

(continued...)

-55-

It does appear that part of the Government's pre-trial theory of the case was that the conspirators destroyed the tape to cover up any evidence of abuse. At trial, however, the only statement that Mr. Schultz complains of with respect to the defendants' alleged destruction of the tape came in closing argument when Mr. Blumberg said that "the removal of the video *camera* was a fake." (emphasis added). This statement in no way indicates that Mr. Schultz destroyed the tape inside the camera. Rather, it references Mr. Schultz's role in the conspiracy—his job was to knock over the video camera so that it would not record the ensuing abuse. Because Mr. Blumberg did not argue before the jury that the defendants destroyed this evidence to cover up their crime, Mr. Schultz's argument is simply without merit.

## VI. SENTENCING

We now turn to issues concerning the Appellants' sentences. Mr. Verbickas was found guilty of a single count of deprivation of civil rights in violation of 18 U.S.C. § 242. The base offense level for a conviction under § 242 is governed by U.S.S.G. § 2H1.1, "Offenses Involving Individual Rights," which directs the court to apply the greatest offense level of:

> (1) the offense level from the offense guidelines applicable to any underlying offense;

---

[21](...continued) argument that the Government destroyed the tape in bad faith in violation of his due process rights under *Trombetta*.

(2) 12, if the offense involved two or more participants;
(3) 10, if the offense involved
    (A) the use of threat of force against a person or
    (B) damages or the threat of property damages; or
(4) 6, otherwise.

U.S.S.G. § 2H1.1(a). The District Court calculated Mr. Verbickas's base offense level at 12 because it concluded that the offense involved two or more participants. *See* U.S.S.G. § 2H1.1(a)(2). It then imposed a six-level enhancement because the offense was committed under color of law, *see* U.S.S.G. § 2H1.1(b)(1); a two-level enhancement because Mr. Lane was a vulnerable victim, *see* U.S.S.G. § 3A1.1(b)(1); and a two-level enhancement because Mr. Lane was restrained during the assault, *see* U.S.S.G. § 3A1.3. The resulting base offense level was 22. The District Court then departed downward two levels because it determined that Mr. Verbickas was especially susceptible to abuse in prison. *See* U.S.S.G. § 5K2.0 (permitting downward departures for circumstances not adequately taken into consideration by the Guidelines). The court further departed another two levels because it found both that the assault was aberrant behavior, *see* U.S.S.G. § 5K2.20, and that Mr. Lane's misconduct substantially contributed to provoking the assault, *see* U.S.S.G. § 5K2.10. The resulting offense level was 18, and Mr. Verbickas had a criminal history score of I, which subjected him to a sentence of 27–33 months' imprisonment. The District Court sentenced him to 30 months. Mr. Verbickas challenges each of the sentencing enhancements except for the under color of law enhancement under *United States*

*v. Booker*, arguing that his offense level before the court's downward departure should only have been 16, *see* U.S.S.G. §§ 2H1.1(a)(3) and (b)(1), with a resulting sentencing range of only 21–27 months.

Messrs. LaVallee and Schultz were found guilty both of conspiracy under 18 U.S.C. § 241 as well as a substantive offense under 18 U.S.C. § 242 for the assault of Mr. Castillo. Because both offenses were committed by two or more people, the District Court determined the base level for both men to be 12. *See* U.S.S.G. § 2H1.1(a)(2). As it had with Mr. Verbickas, the District Court applied a six-level enhancement for acting under color of law, *see* U.S.S.G. § 2H1.1(b)(1); a two-level enhancement for a vulnerable victim, *see* U.S.S.G. § 3A1.(b)(1); and a two-level enhancement for committing the offense while the victim was restrained, *see* U.S.S.G. § 3A1.3. Because the Guidelines prohibit the grouping of conspiracy and substantive offenses when the conspiracy has another object besides the substantive offense, *see* U.S.S.G. § 3D1.2 cmt. 4, the District Court added another two levels under U.S.S.G. § 3D1.4(a) (requiring the addition of two levels for offenses constituting two equally serious groups). The court then granted a two-level departure for susceptibility to abuse in prison. *See* U.S.S.G § 5K2.0. With a resulting offense level of 22 and a criminal history score of I, the applicable Guidelines range was 41–51 months' incarceration. Messrs. LaVallee and Schultz were both sentenced to 41 months. Both contend that the District Court committed error under *Booker* which resulted in the

imposition of a higher sentence than that warranted by facts found by the jury.

A.     Booker *Error*

In *Booker*, the Supreme Court held that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. As a remedy, the Court severed the statutory section requiring district courts to sentence within the Guidelines range. *Id.* at 756–57. We recognize two types of *Booker* errors: constitutional and non-constitutional. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir. 2005). A constitutional *Booker* error occurs when a court "[relies] upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily." *Id.* A non-constitutional error arises when a sentencing court "appl[ies] the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction." *Id.* at 731–32. These appeals allege constitutional *Booker* error.

Because all three Appellants challenge such error for the first time on appeal, we review for plain error. Fed. R. Crim. P. 52(b); *Gonzalez-Huerta*, 403 F.3d at 732. To establish plain error, the Appellants "must demonstrate that (1)

-59-

the District Court committed error, (2) that the error was plain, and (3) that the plain error affected [their] substantial rights. *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005). If each condition is met, "a court reviewing the error may exercise discretion to correct it if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* When reviewing a potential constitutional error, we conduct this analysis less rigidly. *Id.* "By now, it is axiomatic under plain error review that a court commits error that is plain when it enhances a defendant's sentence based on judicially-found facts." *United States v. Taylor*, 413 F.3d 1146, 1155 (10th Cir. 2005). We will therefore limit our review to the third and fourth prongs of the plain error test.

To satisfy their burden on the third prong of plain error, the Appellants must establish that their substantial rights were affected—that is, they must show to a "reasonable probability" that the error in sentencing affected the outcome of the proceedings. *Dazey*, 403 F.3d at 1175. We have identified at least two ways a defendant can make this showing in the case of constitutional *Booker* error:

> First, if the defendant shows a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence, then the defendant successfully demonstrates that the error below affected his substantial rights. . . . Second, a defendant may show that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a) the district court judge would reasonably impose a sentence outside the Guidelines range.

-60-

*Id.* (footnote omitted).

If the Appellants satisfy the first three prongs of plain error review, they must then persuade this Court that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. We have stated that a defendant can meet this burden by presenting evidence that:

> (a) a sentence increased substantially based on a *Booker* error; (b) a showing that the district court would likely impose a significantly lighter sentence on remand; (c) a substantial lack of evidence to support the entire sentence the Guidelines required the district court to impose; (d) a showing that objective consideration of the § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines; or (e) other evidence peculiar to the defendant that demonstrates a complete breakdown in the sentencing process.

*United States v. Serrata*, 425 F.3d 886, 919 (10th Cir. 2005).

1.     *Mr. Verbickas's Sentence*

Mr. Verbickas has failed to satisfy the third prong of establishing plain error. First, he has failed to show that a jury applying a reasonable doubt standard would not have found the same material facts. Indeed, Mr. Verbickas did not challenge the factual basis of any of the enhancements at the District Court (and does not do so here). Rather, with respect to the enhancements based on the condition of the victim (restrained and vulnerable), Mr. Verbickas's contentions were legal claims.[22]  *Cf. United States v. Riccardi*, 405 F.3d 852, 876

---

[22]For example, Mr. Verbickas argued that if the District Court imposed one of the enhancements, it should not impose the other because it would constitute

(continued...)

(10th Cir. 2005) (in harmless error analysis, stating that defendant's decision not to contest the facts supporting an enhancement indicates that constitutional *Booker* error did not affect substantial rights). Moreover, the record is replete with testimony that Mr. Lane was in fact restrained and that he was in fact "vulnerable" within the meaning of the Guideline provision. *See* U.S.S.G. § 3A1.1; *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003) (inmate who was completely dependent on correctional officers for care, was locked in cell, and was unable to protect himself from assault was vulnerable victim); *United States v. Hershkowitz*, 968 F.2d 1503, 1504–06 (2d Cir. 1992) (inmate beaten while surrounded by correctional officers was vulnerable victim). With respect to the enhancement based on the offense involving two or more participants, the record shows that Ms. Gutierrez pleaded guilty to abusing Mr. Lane. Finally, it is clear from the jury's verdict that it found Mr. Verbickas was acting under color of law. Indeed, a finding that the defendant acted under color of law in depriving an inmate of a constitutional right was explicitly listed as an element of § 242 in the jury instructions. Accordingly, Mr. Verbickas has in no way demonstrated that a jury applying a reasonable doubt standard would not have found the same facts as the District Court which gave rise to the enhancements.

---

[22](...continued)
impermissible "double counting," which he does not raise here.

Second, Mr. Verbickas has failed to show that the District Court, applying the sentencing factors in § 3553(a), might have imposed a sentence outside the Guidelines range. The judge did not express any dissatisfaction with the length of the sentence or indicate that he felt that it was inappropriate in light of all the circumstances. *See Dazey*, 403 F.3d at 1175. Further, the District Court imposed a sentence in the middle of the applicable Guidelines range, even though it was within the court's power to impose a shorter sentence under the pre-*Booker* scheme. That it was not inclined to do so suggests that the judge would not exercise "his now greater [post-*Booker*] discretion to reduce the sentence." *United States v. Riccardi*, 405 F.3d 852, 876 (10th Cir. 2005).

We are aware that this Court recently found that constitutional *Booker* error affected a defendant's substantial rights even though the district court had granted a five-level downward departure that took into consideration several of the sentencing factors recommended by § 3553(a)(1). *See Serrata*, 425 F.3d at 918. Though the District Court in this case took several of the § 3553(a)(1) sentencing factors into account in granting Mr. Verbickas a two-level downward departure, we think that *Serrata* is distinguishable for several reasons. First, in *Serrata* we found that "the most telling evidence" that the defendant's substantial rights were violated was that the district court "repeatedly expressed its dissatisfaction with the guidelines" and stated that it would sentence each defendant to probation if the Guidelines so permitted. *Id.* at 919. Second, the district court sentenced each

defendant to the lowest possible sentence in the applicable Guidelines range. *Id.*

Third, this Court found that the district court abused its discretion in departing

downward—we acknowledged that although departure was not warranted under

the Guidelines, post-*Booker*, the same factors may warrant departure pursuant to

§ 3553(a)(1).[23] *Id.; cf. United States v. Ollson*, 413 F.3d 1119, 1121 (10th Cir.

2005) (finding that defendant's substantial rights not violated when district court

properly exercised discretion to depart downward and could have departed further

if it determined further departure was warranted). None of these circumstances

are present in this case. We therefore conclude that Mr. Verbickas has failed to

establish that but for the improper judicial fact-finding, the result of his

proceeding would have been different.

2. *Mr. LaVallee's and Mr. Schultz's Sentences*

As noted above, the enhancement for acting under color of law, *see*

U.S.S.G. § 2H1.1(b)(1), is fully reflected in the jury's verdict. The same can be

said of the enhancement under U.S.S.G. § 2H1.1(a)(2) (offense committed by two

or more people) because both Mr. LaVallee and Mr. Schultz were convicted of

conspiracy under 18 U.S.C. § 241, which requires "two or more persons" as an

---

[23]We also note that because the court in *Serrata* held that the district court abused its discretion in imposing a five-level downward departure thus requiring remand, the court's discussion of *Booker* error is dicta. *See United States v. Sims*, 428 F.3d 945, 966 (10th Cir. 2005) (declining to address *Booker* issues when district court abused its discretion in departing downward).

element of the offense. Accordingly, these enhancements do not constitute constitutional *Booker* error.

In addition, the facts giving rise to the two-level enhancement under U.S.S.G. § 3D1.4(a), which is predicated on a finding that the substantive offense was not "the sole object of the conspiracy," *see* U.S.S.G. § 3D1.2 cmt. 4, are also implicit in the jury's verdict. The jury instructions provided that the jury must find beyond a reasonable doubt that the Government proved "that the single overall conspiracy alleged in Count I of the superceding indictment existed." The superceding indictment alleged that the defendants engaged in a conspiracy to (1) unjustifiably strike, kick, assault, injure, and physically punish inmates; (2) falsely justify uses of force against inmates by falsifying records and fabricating injuries; (3) threaten officers to secure their silence; and (4) perpetuate an environment within the prison allowing unlawful beatings and assaults against inmates to continue indefinitely and with impunity. Clearly, then, the jury's guilty verdict against Mr. LaVallee and Mr. Schultz on the conspiracy charge reflects the fact that the Government proved beyond a reasonable doubt that the beating of Mr. Castillo was not the sole object of the conspiracy. Therefore, this enhancement is also not constitutional *Booker* error.

Accordingly, only the other two enhancements—one two-level enhancement for a vulnerable victim and another two-level enhancement for a restrained victim—potentially violate *Booker*. Without these enhancements, the

sentencing range supported by the jury's findings was 33–41 months' imprisonment, based on an offense level of 20 rather than 24. The District Court exercised its discretion to depart downward two levels from 24 to 22, however, and thus calculated the applicable sentencing range to be 41–51 months; the court ultimately sentenced both Mr. LaVallee and Mr. Schultz to 41 months. We stated in *United States v. Yazzie* that:

> *Booker* made clear that it is the actual sentence, not the sentencing range, that must not be increased based upon judge-found facts in order to violate the Sixth Amendment: "Accordingly, we reaffirm our holding in *Apprendi*: Any fact (other than a prior conviction) which is necessary to support a *sentence* exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

407 F.3d 1139, 1144 (10th Cir. 2005) (quoting *Booker*, 125 S. Ct. at 756). Because the District Court's judicial fact-finding did not increase the sentence beyond that authorized by the jury's verdict, there was no constitutional error. *Id*.; *see also United States v. Small*, 423 F.3d 1164, 1188 (10th Cir. 2005).

Nevertheless, it is clear on appeal that the District Court's mandatory application of the Guidelines still constitutes non-constitutional *Booker* error that is plain. We need not decide whether Messrs. LaVallee's and Schultz's substantial rights were affected, however, because they have failed to satisfy their burden on the fourth prong of plain error analysis. *See Yazzie*, 407 F.3d at 1146 (declining to conduct a substantial-rights analysis because defendant could not

satisfy the fourth prong of plain-error review). We will not notice non-constitutional error "unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice." *Id.* The Appellants have made no such showing here.

B.    Cross-Appeal

It its cross-appeal, the Government raises three arguments. First, it argues that the District Court erred in failing to impose an enhancement to each Appellant's sentence for obstruction of justice. Second, it argues that the District Court erred in granting the Appellants a two-level downward departure due to their susceptibility to abuse in prison. Third, it argues that the District Court erred in granting Mr. Verbickas an additional two-level downward departure due to the inmate's provocation of the offense behavior and Mr. Verbickas's aberrant behavior.

Post-*Booker,* district courts, though not bound by the Guidelines, must consult the Guidelines and consider them in sentencing. *See Booker*, 125 S. Ct. 738, 767 (2005). This consultation requirement normally obliges the district court to calculate correctly the sentencing range prescribed by the Guidelines. *See United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir.2005); *United States v. Sierra-Castillo*, 405 F.3d 932, 936 n.2 (10th Cir. 2005). In considering the district court's application of the Guidelines, we review its factual findings for clear error, and its legal determinations de novo. *Serrata*, 425 F.3d at 906.

"We give due deference to the district court's application of the guidelines to the facts." *Id.* (quotation omitted).

The Government first argues that the District Court erred in failing to apply an obstruction of justice enhancement to each of their sentences pursuant to U.S.S.G. § 3C1.1. As an initial matter, we recognize that if the District Court had applied the obstruction of justice enhancement to increase the Appellants' sentences mandatorily, it would have committed constitutional *Booker* error. *See United States v. Corchado*, 427 F.3d 815, 821 (10th Cir. 2005). *Booker* made its remedial interpretation of the Guidelines applicable to all cases on direct review, however, and we therefore must still consider the merits of the Government's cross-appeal. *See Booker*, 125 S. Ct. at 769; *United States v. Lynch*, 397 F.3d 1270, 1272 (10th Cir. 2005).

With respect to this claimed error, the Government suffers the same fate as the Appellants in their claim of error related to the discovery of alleged promises made to Ms. Gutierrez in exchange for her testimony. The District Court's ruling on this issue is conspicuously missing from the transcript and the Government has otherwise failed to point to the place in the record where this discussion is found. Because we must be informed by the District Court's findings of fact and its application of the Guidelines to the facts, the Government's failure to ensure that the record has been supplemented with the relevant transcripts is fatal to its claim. *See* 10th Cir. R. 28.2(C)(2), (3); *United States v. LaHue*, 261 F.3d 993,

1014–1015 (10th Cir. 2001).

Next, the Government argues that the District Court erred in granting each Appellant a two-level downward departure based on their susceptibility to abuse in prison under U.S.S.G. § 5K2.0. We review downward departures under a unitary abuse of discretion "which includes review to determine that the discretion of the district court was not guided by erroneous legal conclusions." *United States v. Collins*, 122 F.3d 1297, 1302 (10th Cir. 1997) (quotation and alteration omitted). In determining whether the district court abused its discretion this Court must evaluate: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable. *Id.* Here, the Government claims only that the District Court erred in finding that the Appellants' susceptibility to abuse in prison removed them from the heartland of cases thus warranting departure.

The fact that police officers are susceptible to abuse in prison does not, alone, warrant a downward departure. *See Koon v. United States*, 518 U.S. 81, 112 (1996). Indeed, in many instances, committing a crime while acting under color of law will result in a higher sentence—as it did in this case—rather than a lower sentence. *See* U.S.S.G. § 2H1.1(b)(1) (permitting enhancement when

offense is committed under color of law). However, when a district court determines that the defendants' susceptibility to abuse is compounded by "widespread publicity and emotional outrage . . . [this] is just the sort of determination that must be accorded deference by the appellate courts." *Koon*, 518 U.S. at 112.

Relying on *Koon,* the District Court found that this case was outside the heartland of the Guidelines because it was part of a vast investigation, spanning several years, that involved not only the abuse of inmates by correctional officers, but also the conspiracy to abuse inmates. In addition to evidence of the size and scope of the investigation, the District Court was presented with other evidence that this case was outside the heartland of cases. For example, there was evidence that the investigation was reported on in a publication distributed among federal inmates; that because of the Appellants' notoriety they were on 23-hour lockdown; and that other inmates threatened the Appellants' lives and described the types of sexual acts they would commit upon their bodies once they were dead. Based on these circumstances, the District Court felt that a two-level downward departure was warranted. We find no abuse of discretion in that determination.

Finally, we address the Government's argument that the District Court abused its discretion in granting Mr. Verbickas a two-level downward departure based on the combined reasons of Mr. Verbickas's aberrant behavior, *see*

U.S.S.G. § 5K2.20, and the victim's misconduct that substantially contributed to provoking the offense behavior, *see* U.S.S.G. § 5K2.10.

Section 5K2.10 provides that:

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense.

U.S.S.G. § 5K2.10. We first note that victim provocation is an "encouraged departure factor." *Koon*, 518 U.S. at 94 (citing U.S.S.G. § 5K2.10). Further, the provoking conduct need not immediately precede the offense behavior. *Id.* at 104; *see also* U.S.S.G. § 5K2.10(3) (instructing courts to consider the danger perceived by the defendant and the victim's reputation for violence). In this case, there was testimony that Mr. Lane made sexually explicit remarks to a female officer, threatened Mr. Verbickas immediately before the assault, and made an aggressive move toward him. Indeed, the District Court noted Mr. Lane's "surly" behavior in granting the departure.

The aberrant behavior exception may apply in an exceptional case when "the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(a), (b). The conduct for which Mr. Verbickas was convicted meets the three requirements of § 5K2.20(b), and there is substantial evidence in the record that this was also an exceptional case,

thus warranting a departure.  We therefore find no abuse of discretion in this case.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the Appellants' convictions and sentences.

No. 03-1515, *United States v. Verbickas*

No. 03-1522, *United States v. LaVallee*

No. 03-1523, *United States v. Schultz*

No. 04-1000, *United States v. Verbickas*

No. 04-1540, *United States v. Schultz*

**BRISCOE**, Circuit Judge, concurring:


I concur in the judgment but write separately to address the issue of Grundy's disqualification, as it relates to LaVallee and Schultz, in greater detail.

I.

Grundy's relationship with the defendants was first brought to the attention of the district court in July 2001, when defendant Gall, who was later acquitted, filed a motion to suppress statements he gave to FBI agents and prosecutors during the pre-indictment investigation.[1] In support of his motion, Gall argued that he was confused and/or misled by Grundy regarding his right to legal representation at the time he gave the statements to the FBI agents and prosecutors. The district court held an evidentiary hearing on Gall's motion on September 25, 2001. ROA, Vol. X. Upon being called by Gall's defense counsel, Grundy first testified generally about her duties at USP-Florence in 1999. According to Grundy, in early 1999 she "was the supervisory attorney with

---

[1] Defendant Pruyne filed a similar motion, but ultimately withdrew it. ROA, Vol. X, at 142.

responsibilities for providing legal services to" employees "of the facilities at Florence" "[i]n connection with their jobs . . . ." Id. at 93. With respect to correctional officers who were sued by inmates alleging abuse, Grundy testified that she would "assist the staff member, if they request[ed] representation by the Department of Justice, in obtaining representation or making the request itself . . . ." Id. In doing so, she would "ask them" for their version of "what happened." Id. Then, "[i]f representation [wa]s granted," she would "assist the United States attorney's office . . . in providing the defense to the civil suit of that particular employee." Id. Grundy then testified about her dealings with defendant Gall. In 1997, Grundy was contacted by either the FBI or an attorney from the DOJ's Civil Rights Division staff and informed that they "would be looking to interview certain correctional officer witnesses . . . ." Id. at 126. Grundy was further informed that, other than being criminal in nature, she could not be told the nature of the investigation being conducted. Id. at 128. In March 1999, and again in July 1999, Grundy was asked by investigators to arrange interviews for them with defendant Gall. Id. at 129. In arranging those interviews, Grundy informed Gall that DOJ lawyers and FBI agents were interested in speaking with him, id., and that he was free to speak or not speak with them. Id. at 130. Grundy further informed Gall that she "could not help him with" the interviews and that she "wasn't going in there." Id. at 131. According to Grundy, Gall did not ask her to arrange legal or union representation for him. Id. at 131-32. The district court

-2-

ultimately denied Gall's motion.  Id. at 236.

Approximately nineteen months later, on April 21, 2003 (the tenth day of trial), all of the defendants filed a joint motion to disqualify Grundy for violating Colorado Rules of Professional Conduct 1.6(a), 1.9, and 1.11(b) and (e).  ROA, Vol. V, Doc. 1080.  In their motion, defendants alleged that Grundy, who by that time was working as an assistant general counsel for the BOP nationally, provided prior representation to them in several respects.  In particular, defendants alleged that while they were employed as correctional officers at USP-Florence, various civil actions were filed against them by inmates, and that Grundy acted as their legal counsel in connection with these actions.  Id. at 2-3.  One such civil action was filed by inmate William Turner and concerned the same alleged conduct that was listed as one of the overt acts in Count I of the superseding indictment, and that formed the basis for Count VIII of the superseding indictment (the jury acquitted defendants LaVallee, Schultz, and Bond on this latter count).  In turn, defendants alleged that Grundy played two roles in the prosecution of the case against them.  First, defendants alleged that Grundy "provided 'liaison' coordination between the BOP and the United States Attorney's Office prosecuting this action until sometime prior to April 1, 2002 as a BOP employee." Id.  Second, defendants alleged that "Grundy became a contract attorney for the United States Attorney prosecuting th[e] matter before the commencement of th[e] trial."  Id.  "In that role," defendants alleged, "Grundy participated in

-3-

witness interviews with the witnesses to be called by the prosecution . . . ." Id. Based upon these allegations, defendants alleged that "a conflict of interest exist[ed] and [that]," pursuant to the Colorado Rules of Professional Conduct cited in their motion, "Grundy's representation of the United States in this matter require[d] her disqualification." Id.

Upon receiving the motion, the district court asked the lead prosecutor to explain Grundy's "role in th[e] case." ROA, Vol. LVI, at 2195. The lead prosecutor explained that Grundy

> ha[d] been assigned by the [BOP] to assist and manage witnesses and just general management of the trial and act as liaison to the prosecution team in order to make sure we get people in and out at the right times and assist with travel and documents and basically logistics for the most part. She is not hired by the U.S. Attorney's office. She is not a special assistant U.S. attorney.

Id. at 2195-96. In addition, the lead prosecutor stated that Grundy "was a general counsel or assistant general counsel for the [BOP]" and "d[id]n't represent the defendants." Id. at 2196. The district court stated it was "tempted to summarily deny th[e motion] as late," but would instead first give the government a chance to respond in writing. Id.

On April 28, 2003, the government filed its written response to defendants' motion to disqualify Grundy. Id., Vol. V, Doc. 1120. Therein, the government asserted that Grundy "[wa]s not a contract attorney for the United States Attorney prosecuting the case at bar," but rather was "Counsel for the [BOP] and ha[d]

-4-

been facilitating the appearance of [BOP] staff at th[e] trial." Id. at 1. "As such," the government argued, Grundy's "presence in the court c[ould not] be equated with the representation of the United States in the prosecution of th[e] case." Id. Further, the government argued that "[i]n her role as Counsel for the [BOP]," Grundy "represented the [BOP] and not the employees of her agency." Id. at 2. Although the government acknowledged that Grundy acted as "a conduit through which [prison] employees obtained representation from the U.S. Department of Justice and United States Attorney's Office for civil suits filed against them in their official capacities," it asserted that such actions were "insufficient to create an attorney-client relationship" with the individual prison employees she assisted. Id. Relatedly, the government asserted that defense counsel were "already aware that civil attorneys from the U.S. Department of Justice and/or the United States Attorney's Office represented their clients in the various suits filed against them by inmates as they ha[d] already moved for notes and statements provided to these attorneys by their clients." Id. at 3. Lastly, the government asserted that "Grundy [wa]s not going to be called as a witness for the government" at trial. Id.

On April 28, 2003 (the same day the government filed its written response), the district court orally denied defendants' motion to disqualify Ms. Grundy. ROA, Vol. LX, at 3212. In doing so, the district court simply stated: "I find it to

be utterly without merit."[2]  Id.

II.

In their opening appellate briefs, LaVallee and Schultz contend that the inclusion of Jenifer Grundy on the prosecution team was a clear conflict of interest. (LaVallee's Br. at 2, issue 3; and Schultz's Br. at 42, issue 5.)  Both LaVallee and Schultz have incorporated by reference the discussion of the Grundy issue contained in Verbickas' opening appellate brief.  Verbickas' brief, in turn, repeatedly emphasizes that each of the defendants, including LaVallee and Schultz, had an attorney-client relationship with Grundy.  In particular, Verbickas' brief states:

> • "The [district] court was made aware of the conflict presented by Grundy's representation of Pruyne, **LaVallee, Schultz** and Bond at the hearing held on July 11, 2001."  Verbickas' Br. at 28 (emphasis added).
>
> • "Grundy had an attorney-client relationship with **the Defendants** because of her position as legal counsel to the USP Florence employees.  During the investigation of this case, all Defendants worked as correctional officers at USP Florence.  As a result of their employment, numerous civil actions were filed by inmates alleging some of the Defendants violated their civil rights, including: *Turner v. Schultz, et al.*, 99-WM-2232 . . . .  These civil actions alleged so-called 'Bivens' violations against the Defendants and other correctional officers.  **LaVallee, Schultz** and Bond, three co-defendants in this trial, were named as Defendants in *Turner*."  Id. at 31 (emphasis added).
>
> • "Grundy represented Pruyne and **these Defendants** regarding their

---

[2] The government, in its appellate brief, asserts the district court denied the motion as untimely.  That assertion, however, is not supported by the record.

-6-

requests for DOJ representation.  She entered into an attorney-client relationship **with Defendants** and gathered relevant information regarding their requests to be afforded DOJ legal representation in these civil actions."  Id. at 32 (emphasis added).

• "Grundy's relationship **with the Defendants** proved there were attorney-client relationships that subjected her to the ethical obligation of preserving confidential communications."  Id. at 38 (emphasis added).

• "**The Defendants** looked to Grundy as **their** lawyer."  Id. at 38 (emphasis added).

• "Grundy advised **Defendants**."  Id. at 39 (emphasis added).

• "Grundy's prior relationship with **the Defendants** constitutes actual impropriety under Colorado law."  Id. at 42.

In sum, the allegations in Verbickas' brief are sufficiently detailed to suggest the district court erred in denying LaVallee's and Schultz's motion to disqualify Grundy.

## II.

We "review a district court's decision on a motion to disqualify counsel for abuse of discretion."  Chavez v. New Mexico, 397 F.3d 826, 839 (10th Cir. 2005); see United States v. Bolton, 905 F.2d 319, 321 (10th Cir. 1990) (same).  "The merits of [a] disqualification motion depend on whether a substantial relationship exists between the pending suit and the matter in which the challenged attorney previously represented the client."  Bolton, 905 F.2d at 321 (internal quotation marks omitted).

In reviewing the district court's ruling, the threshold question is whether an

-7-

attorney-client relationship existed between Grundy and either LaVallee or Schultz. According to defendants' motion, a USP-Florence inmate named William Turner filed a federal civil action against LaVallee and Schultz (as well as defendant Bond) asserting they violated his constitutional rights by physically abusing him. Although it is not entirely clear from the record, it appears that LaVallee and Schultz sought and received representation from the Department of Justice with respect to this civil action and, in doing so, worked at least initially with Grundy. Based upon the testimony Grundy gave during the evidentiary hearing on defendant Gall's motion, it appears that she would have interviewed LaVallee and Schultz in order to obtain their version of events and, in turn, would have assisted them in obtaining representation from other DOJ attorneys. As the supervisory attorney at USP-Florence, Grundy followed this general procedure when a USP-Florence employee sought DOJ representation after being sued by an inmate. Assuming these facts are true (the government has never seriously disputed these facts), it appears that an attorney-client relationship did, in fact, exist between Grundy and these two defendants. According to 28 C.F.R. § 50.15(a)(3), "[a]ttorneys employed by any component of the Department of Justice who participate in any process utilized for the purpose of determining whether the [DOJ] should provide representation to a federal employee, undertake a full and traditional attorney-client relationship with the employee with respect to application of the attorney-client privilege." This provision would

clearly encompass Grundy, since she allegedly "participate[d] in [the] process utilized" by the DOJ for determining whether it would provide representation to USP-Florence employees.

Assuming, then, that Grundy had an attorney-client relationship with LaVallee and Schultz regarding the William Turner lawsuit, the question then becomes whether, pursuant to the Colorado Rules of Professional Conduct cited by defendants in their original motion, that relationship barred Grundy from acting as a "liaison" to the DOJ attorneys prosecuting the defendants.

Defendants first cited to Rule 1.6(a), entitled *Confidentiality of Information*, which states:

> A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

Applying that rule to the circumstances here, there is no evidence, and no express assertion by defendants, that Grundy revealed to the prosecution team any information that was provided to her by LaVallee or Schultz in connection with the civil suit filed against them by inmate Turner. Nor does it appear to be a reasonable assumption that, by simply coordinating BOP witnesses for the prosecution team, Grundy necessarily would have disclosed any such information. Thus, there is no basis for concluding that Grundy's role as "liaison" to the prosecution team resulted in a violation of Rule 1.6(a).

The second rule cited by defendants was Rule 1.9(a), entitled *Conflict of Interest: Former Client*, which states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Applying that rule to the circumstances present here, it appears, for the reasons already discussed, that Grundy likely had an attorney-client relationship with LaVallee and Schultz in connection with the civil lawsuit filed by inmate Turner. Further, as noted, that civil lawsuit was apparently based upon some of the same allegations of abuse as set forth in the superseding indictment. Thus, Rule 1.9(a) would have prohibited Grundy from representing any interests that were adverse to defendants LaVallee and Schultz. Based upon the information contained in the government's response to defendants' motion to disqualify Grundy, however, there is no indication that she ever acted as government counsel in these criminal proceedings. In other words, although defendants have characterized Grundy as a "member of the prosecution team," it appears that she, in fact, simply helped to coordinate BOP witnesses for the DOJ attorneys who represented the government in this case, and otherwise played no role in the investigation or prosecution of the charges against defendants. Thus, Rule 1.9(a) was not violated.[3]

_____

[3] Even assuming, for purposes of argument, that Grundy could have been considered a member of the prosecution team, any resulting violation of Rule

(continued...)

Finally, defendants cited Rule 1.11, entitled *Successive Government and Private Employment*, which states, in pertinent part:

> (b) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.
>
> * * *
>
> (e) As used in this Rule, the term "confidential government information" means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is prohibited from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public.

Clearly, this rule has no application here, since Grundy has continuously worked for the BOP and has never worked in private practice representing a private client.

In sum, I conclude there was no merit to defendants' motion to disqualify Grundy, and thus the district court did not abuse its discretion in denying that

---

[3](...continued)
1.9(a) was harmless. In particular, the jury acquitted defendants LaVallee and Schultz of the substantive charge that alleged the beating of inmate William Turner. Further, LaVallee's and Schultz's conspiracy convictions rested upon their role in beating inmate Pedro Castillo and then concealing evidence of that beating.

motion.